Gerardo VALDEZ, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–90–461.

Court of Criminal Appeals of Oklahoma.

March 15, 1995.

Rehearing Denied April 14, 1995.

Robert R. Robles, Oklahoma City, for defendant at trial.

Jamie D. Pybas, Asst. Appellate Indigent Defender, Norman, for appellant on appeal.

Melvin R. Singleterry, Dist. Atty., W.R. Moon, Asst. Dist. Atty., Chickasha, for State at trial.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, for appellee on appeal.

## OPINION

CHAPEL, Vice Presiding Judge.

Gerardo Valdez was tried by a jury and convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.Supp. 1982, § 701.7(A), in the District Court of Grady County, Case No. CRF–89–139. The jury found the existence of the following three aggravating circumstances: that Valdez posed a continuing threat to society; that the death was especially heinous, atrocious or cruel; and, that in perpetrating the homicide, Valdez created a great risk of death to more than one person. In accordance with the jury's recommendation, the Honorable James R. Winchester sentenced Valdez to death. We affirm.

The murder in question occurred in April of 1989. One evening, Valdez and the victim, Juan Barron, met through mutual friends in a bar. Barron was a homosexual who apparently showed an interest in Valdez. Testimony revealed that throughout the evening, Barron and Valdez talked and occasionally embraced. While Valdez consumed approximately ten, 3.2 beers during the course of the evening, he and other witnesses testified that he did not become drunk.

When the bar closed, Valdez took his friend, Martin Orduna, and Barron to his house. Orduna testified he was reluctant to enter because he thought Valdez and Barron were going to have sex. Orduna did, however, go inside Valdez's house with Valdez and Barron. The following is Orduna's account of what occurred there on that evening: Valdez obtained a gun shortly after the three men went into his house; Valdez told Barron he was going to kill him and began slapping Barron; Valdez showed Barron a Bible and told him that according to it, homosexuals do not deserve to live; Valdez asked Barron if he wanted Valdez to castrate or kill him; Valdez made Barron remove his clothes and then began hitting and slapping Barron; Barron eventually got angry and started fighting back; Valdez then shot Barron twice in the forehead, but Barron continued fighting; Valdez hit Barron in the side of the head with the gun; while Barron lay on the couch, Valdez retrieved a kitchen knife and slit Barron's throat; Barron shook and then died. Valdez and Orduna carried Barron, the couch and surrounding rug to Valdez's backyard and burned them. Barron's scant remains were discovered there about three months later.

Valdez's trial strategy was to admit guilt but raise an insanity defense. His testimony about the events preceding, including and following the murder was consistent with Orduna's. Valdez testified that homosexuality is a sin according to the Bible, and he wanted to help Barron understand the error of his ways. Valdez said he became angry and killed Barron when Barron refused to listen to the Bible's message.

## PRETRIAL AND JURY SELECTION ISSUES

■ Valdez argues in his first proposition that the Oklahoma statutory definition of competence found at 22 O.S.Supp.1991, § 1175.1, is unconstitutional because it does not reflect the United States Supreme Court's definition of competence set forth in *Dusky v. United States*.[1] Under the Supreme Court standard, an accused is competent to stand trial if they 1) possess a rational as well as a factual understanding of the proceedings against them, and 2) can rationally assist counsel.[2] An accused is considered competent under section 1175.1 if they

---

1. 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

2. We note that "[w]hether a defendant is competent to stand trial is a question of federal constitutional law." *White v. Estelle*, 459 U.S. 1118, 1121, 103 S.Ct. 757, 758, 74 L.Ed.2d 973 (1983) (Marshall, J., dissenting).

can "understand the nature of the charges and proceedings brought against [them], and [can] effectively and rationally assist in [their] defense." Valdez claims Oklahoma's definition of competence does not meet the Supreme Court standard because rather than requiring that an accused be able to **rationally** and **factually** understand the proceedings, it requires merely that an accused be able to understand the **nature** of the proceedings.

We recently rejected this attack on the constitutionality of section 1175.1 in *Lambert v. State,* [3] concluding that there is little or no difference between our statutory terms and those used in *Dusky*. Further, the Supreme Court does not appear to require that state legislatures use the **exact** "factual and rational" terminology set forth in *Dusky*. This is evidenced by the fact that the Supreme Court itself has since used terms other than these to define competence. For example, in *Drope v. Missouri,* [4] the Court found that to be competent under the Due Process Clause, a defendant must have "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." [5]

■ Valdez next argues that the trial court's determination that he was competent violated due process. He begins his argument by claiming that the trial court and competency evaluator Dr. John Quinn failed to adequately consider whether he had a **rational** and **factual** understanding of the proceedings, and instead focused simply on whether he understood the **nature** of the proceedings. Valdez concludes his argument with an overall attack upon the sufficiency of

the trial court's final competency determination, citing an affidavit from Roger Enfield, Ph.D., which states that Dr. Quinn failed to sufficiently analyze Valdez's competence. In his affidavit, Dr. Enfield states that Dr. Quinn's analysis did not meet Standard 7–3.7 of the *ABA Criminal Justice Mental Health Standards* (1989). Valdez failed to object to Dr. Quinn's competency evaluation or to the trial court's competency determination. Accordingly, this review is for plain error only. [6]

We have determined that the section 1175.1 definition of competence, which requires that an accused understand the nature of the proceedings, meets Supreme Court standards. Accordingly, both Dr. Quinn during his evaluation and the judge during the subsequent post-examination competency hearing applied the constitutionally appropriate definition of competence in reaching their respective conclusions that Valdez was fit to stand trial. Dr. Quinn's written evaluation also met the requirements set forth in 22 O.S.1981, § 1175.3, and was thus sufficient. While the evaluation was largely conclusory, section 1175.3 does not require that such a report provide the sort of details set forth in ABA Standard 7–3.7. [7]

■ Further, the trial court's finding of competence did not constitute an abuse of discretion. [8] An accused at the post-examination competency hearing is presumed competent and thus bears the burden of proving incompetence by clear and convincing evidence. [9] Because the question whether an accused is competent is one of fact, the standard of appellate review is whether the record reveals valid evidence which tended to support the trier of fact's determination. [10]

3. 888 P.2d 494 (Okl.Cr.1994).

4. 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975).

5. *Id. See also Godinez v. Moran,* —— U.S. ——, ——, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993) (citing both *Drope* and *Dusky* as examples of the federal competency standard).

6. Plain errors are errors which counsel failed to preserve through a trial objection but which, upon appellate review, are clear from the record and affect substantial rights. *See United States v. Olano,* 507 U.S. ——, ——, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993).

7. *See also Siah v. State,* 837 P.2d 485, 487 (Okl. Cr.1992) (concluding that "[t]his Court has never imposed a static analysis for the lower court to apply in all post-examination competency hearings....").

8. *Id.* at 487.

9. *See* 22 O.S.1981, § 1175.4(B).

10. *See Miller v. State,* 751 P.2d 733, 738 (Okl.Cr. 1988).

Dr. Quinn testified that he spent one and one-half hours evaluating Valdez; that Valdez was competent to participate and assist in his defense; and that Valdez understood the nature and potentially severe consequences of the charge against him. In his written evaluation, Dr. Quinn found that Valdez was coherent and not mentally ill according to the definition set forth in the Oklahoma statutes. Valdez did not offer any witnesses at the hearing and thus failed to meet his burden to prove his incompetence. This record contains sufficient evidence to support the trial judge's determination that Valdez was competent to stand trial. This proposition is denied.

■ Valdez claims in his eleventh proposition that the trial court erred in refusing to grant his motion for individual voir dire. He presented two grounds in support of his motion: that jurors who had been exposed to pretrial publicity about the case could give others prejudicial information; and that jurors would respond more honestly to questions concerning bias, prejudice and death penalty attitudes if they were questioned separately.

Valdez acknowledges there is no right to individual **voir dire**.[11] The trial court's decision to grant or deny a motion for individual **voir dire** is a discretionary one.[12] Valdez has not presented evidence to support a conclusion that the trial court abused its discretion in denying his motion for individual **voir dire**. Therefore, this proposition is denied.

## GUILT/INNOCENCE ISSUES

■ In proposition two, Valdez claims that his July 25, 1989 confession should not have been admitted against him because he gave this statement without knowingly and intelligently waiving his *Miranda* rights. Valdez does not dispute the fact that police properly administered the *Miranda* warning. He argues that his inability to sufficiently speak and understand English, his lack of prior

experience with the criminal justice system, and his low intelligence rendered him incapable of validly waiving his *Miranda* rights. Defense counsel neither filed a motion to suppress this statement nor objected to its admission on the grounds that it was not voluntarily made.[13] This proposition will therefore be reviewed for plain error.

On the evening of July 24, 1989, several months after Barron's murder, Deputy Terry Cunningham, Investigator Dan Benson and Detective Susan Hart executed a search warrant at Valdez's residence. Deputy Cunningham gave Valdez the *Miranda* warning upon entering his home. Cunningham testified that Valdez conversed with him in English and appeared to understand his rights.

When asked if he had any firearms, Valdez produced a .22 revolver. The police then looked for Barron's remains which they believed were located in the backyard barbecue pit. They found what appeared to be a bone fragment.

The officers then asked Valdez to accompany them to the local police station, and he agreed. Investigator Benson administered another *Miranda* warning upon their arrival. Again, Valdez spoke in English without the aid of an interpreter. Throughout the interrogation, Valdez denied any involvement in Barron's death.

While driving back to Valdez's home, Cunningham told Valdez he would feel better if he told them the truth. Benson then asked Valdez if he would show them what he had done with the body. When they returned to Valdez's home during the early morning hours of July 25, 1989, Valdez showed them where he had burned Barron's body. Deputy Cunningham then read the *Miranda* warning a third time, and asked Valdez if he understood his rights. Valdez said he did. When Cunningham asked Valdez to sign the waiver of rights form, Valdez asked to read it first. Valdez then signed the waiver and

**11.** *See Fontenot v. State*, 881 P.2d 69, 75 (Okl.Cr. 1994); *Malone v. State*, 876 P.2d 707, 711 (Okl. Cr.1994).

**12.** *Trice v. State*, 853 P.2d 203, 209 (Okl.Cr. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

**13.** Defense counsel also declined the judge's offer to hold a hearing under *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), to determine whether Valdez gave the confession voluntarily.

confessed to having killed Barron. His confession was taped and the tape was played to the jury.

▮▮▮▮ Valdez clearly was in custody at the time of his confession and therefore entitled to the *Miranda* warning. A reasonable man in Valdez's position would not have felt free to leave the company of two police officers to whom he had admitted killing someone.[14] Because police continued questioning Valdez after administering the required *Miranda* warning, the State bears a heavy burden to show that Valdez's waiver was valid.[15] The totality of the circumstances surrounding the interrogation must show that the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." [16]

Valdez argues that because of his low intelligence quotient and his inability to fully comprehend the English language, he was incapable of understanding either the nature of his rights or the consequences of abandoning them.[17] As evidence of his lack of comprehension, Valdez first notes that Benson interrogated him by asking leading questions rather than by simply allowing Valdez to tell his story. He argues that the interrogation proceeded in this manner because Benson realized Valdez would be unable clearly to describe the events in his own words. Valdez then points to one of the responses he gave toward the end of the interrogation. When Benson asked Valdez whether he had willingly signed the *Miranda* waiver and voluntarily agreed to talk to the police, Valdez responded, "Yes. I understand it a little bit and I sign it because I understand it something about a lawyer and he want to ask me questions and that's what I'm looking for a lawyer." Valdez claims his response indicated he was confused about what was happening to him and wanted to speak to a lawyer.

The taped interview clearly shows that Valdez does not speak perfect English. However, Valdez's answers to many of Benson's questions suggest that he fully comprehended what was being said to and asked of him. For example, Valdez correctly and clearly answered questions about the proper spelling of his name, his date of birth, his social security number, his address, and the caliber of gun he had used to shoot Barron. While many of the questions concerning the circumstances surrounding Barron's murder required only a "yes" or "no" answer, many of the questions also elicited more substantive responses. Valdez was able to understand that he was being asked who had left the bar with him on the night in question ("Alfonso, Martin, Barron"); what those individuals' last names were ("Alfonso Borjas. Martin, I don't know"); where he had taken Alfonso ("I take him to the work. He work for Daniel's Dairy in Pocasset"); what he told Barron he would do to him ("I want to castrate"); what Barron said in response to that ("No he said he don't want to"); whether he shot Barron ("Yea a couple of times"); whether Barron immediately died of his wounds ("No, he did not die"); what he did then ("I take my pocket knife and cut him in the throat"); and, whether he burned the body ("I put in the couch, put in the carpet and put a lot of firewood and burned it").

**14.** *See Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

**15.** *Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). To be valid, such a waiver must also have been voluntary. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Our waiver analysis does not address this issue because Valdez does not claim that his waiver was involuntary.

**16.** *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141.

**17.** The United States Court of Appeals for the Ninth Circuit has recognized that "language difficulties may impair the ability of a person in custody to waive [their *Miranda* rights] in a free and aware manner." *U.S. v. Heredia–Fernandez,* 756 F.2d 1412, 1415 (9th Cir.1985). *See also U.S. v. Short,* 790 F.2d 464, 469 (6th Cir.1986) (holding that accused's waiver of *Miranda* rights was unknowing and unintelligent where accused spoke broken English, had a deficient understanding of the English language and knew nothing about the American criminal justice system). *But see U.S. v. Bautista–Avila,* 6 F.3d 1360, 1365–66 (9th Cir.1993) (concluding that an accused who received *Miranda* warnings in Spanish and who then stated that he understood those rights knowingly and intelligently waived them).

Cunningham testified that after he administered the *Miranda* warning to Valdez, he asked Valdez whether he understood those rights. Valdez said he did. Prior to handing him the written waiver form, Cunningham asked Valdez whether he could read English. Valdez said he could, and apparently asked Cunningham if he could read the form himself. After Valdez again reiterated that he understood what was on the waiver form, Cunningham asked him to sign it. Benson, who was present during all interrogations of Valdez, gave testimony consistent with Cunningham's.

During trial, defense counsel did not attempt to impeach this testimony. In fact, none of the witnesses [18] called by the defense during the first stage of trial offered any testimony concerning Valdez's lack of education, his difficulty comprehending English,[19] or more specifically his inability to understand the *Miranda* warning which had been read to him. Considered in the absence of specific evidence to support his lack of comprehension claim, Valdez's assurances over the course of the evening that he understood his *Miranda* rights, coupled with his objectively verfiable ability to understand and answer the questions posed to him during the final interrogation,[20] provide sufficient proof that he knowingly and intelligently waived his *Miranda* rights prior to confessing on July 25th, 1989. This proposition is denied.

In his third proposition, Valdez claims his July 26th, 1989 confession to Agent A.J. Irwin violated his Fifth and Sixth Amendment

rights to counsel and should have been suppressed. The facts preceding this statement were as follows. After confessing to police during the early morning hours of July 25th, 1989, Valdez was arrested, taken to the police station and formally charged.[21] Valdez made his initial appearance in court on the 26th.

Also on the 26th at approximately 10:00 a.m.,[22] the Grady County Sheriff's office contacted U.S. Immigration and Naturalization Service Special Agent A.J. Irwin who speaks fluent Spanish. Irwin was asked to assist "in an investigation in which Mexican Nationals were prospective suspects and material witnesses." [23] According to Irwin's report, he agreed to offer his assistance "to ensure that no language discrepancy would jeopardize the investigation and anticipated criminal prosecution of the alleged perpetrators." [24] At trial, Irwin clarified his role in the investigation. He testified that he was at that time assigned to the Alien Criminal Apprehension Program. That program "involve[d] joint efforts with state and local law enforcement agencies investigating matters where aliens are suspected of criminal activity." [25]

After speaking with witnesses Orduna and Borjas, Irwin interviewed Valdez "in regards to his alienage and legal immigration status in the United States." [26] The entire interview was conducted in Spanish per Valdez's request. According to Irwin's report, Irwin identified himself and twice emphasized to Valdez that he was there only "to establish [Valdez's] alienage and legal immigration sta-

---

**18.** Those witnesses included Valdez, two psychiatrists and a psychologist.

**19.** According to Dr. Cecil Mynatt, the State psychiatrist who examined Valdez, Valdez understood some English. Mynatt testified there were some things about which he and Valdez could converse in English. Defense psychologist Dr. Phillip J. Murphy also testified that Valdez "is in the average range of intellectual functioning." He also testified that some of the written tests administered to Valdez were in English.

**20.** Valdez argues it is significant that he was provided an interpreter in all proceedings which occurred after his interrogation. However, Valdez testified at trial in English, only occasionally asking the interpreter for assistance.

**21.** The State in its brief claims that counsel was appointed for Valdez on the 25th.

**22.** Irwin's report reflects that his contact with Valdez occurred on July 25th. At trial, however, Irwin testified that he believed he had erred in his report and that the meeting actually took place on July 26th.

**23.** Appellant's brief, Exhibit 3 at 1 (Irwin's Memorandum of Investigation).

**24.** *Id.*

**25.** Tr. IV, pp. 70–71.

**26.** Appellant's brief, Exhibit 3 at 8.

tus in the United States."[27] Irwin then administered the *Miranda* warning. Valdez told Irwin he wished to offer information to him without the assistance or presence of legal counsel.[28]

· Valdez initially described his immigration status. He then told Irwin "that he wanted to converse with a Spanish speaking law enforcement official concerning the matter for which he was incarcerated."[29] In his report, Irwin noted that he again told Valdez that he did not have to offer information about the homicide. Irwin told Valdez he was satisfied with Valdez's immigration status. Yet, Valdez insisted on telling his story in Spanish and proceeded to explain what happened on the night he killed Barron.

At trial, the prosecutor did not ask Irwin to describe Valdez's story. Rather, he asked Irwin to tell the jury what Valdez had told Irwin, which was that "he [Valdez] was not insane and ... did not intend to use an insanity plea or defense."[30] Irwin also testified that Valdez showed no remorse for having killed Barron. The prosecutor reiterated Valdez's lack of remorse during second stage closing argument to support the continuing threat aggravator. This proposition will be reviewed for plain error only because Valdez neither moved to suppress this statement nor objected when Irwin testified.

Valdez bases his Fifth Amendment claim on the theory that at the end of his initial July 25th confession,[31] he invoked his *Miranda* right to counsel for all future police-initiated interrogations concerning any possible crime in which he might be implicated. At the close of Valdez's July 25th statement, Detective Benson asked him whether he had willingly signed the waiver form and spoken with the police. Valdez said, "Yes, I understand it a little bit and I sign it because I understand it something about a lawyer and he want to ask me questions and that's what I'm looking for a lawyer."[32] Valdez was not questioned again until the Irwin interrogation.

Once an accused in custody "express[es] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."[33] If police reinitiate communication with a suspect who has invoked his Fifth Amendment right to counsel, any subsequent *Miranda* waiver is simply invalid.[34] Additionally, the Fifth Amendment right to have counsel present during custodial interrogation is non-offense-specific. Once it is invoked, police may not initiate interrogation concerning **any** offense, past or present, charged or uncharged.[35]

Clearly, Irwin initiated the July 26th interrogation. Although he did so purportedly to ask Valdez about his immigration status and not about the homicide, this questioning would have been constitutionally prohibited if Valdez had—at the close of the July 25th statement—invoked his Fifth Amendment right to have counsel present. We now turn to that issue.

The Supreme Court recently held in *Davis v. United States*[36] that the Fifth Amendment right to have counsel present during custodial interrogation is not invoked unless a suspect **clearly** and **unambiguously** asserts it.[37] Only those statements that can "reasonably be construed to be an expression

---

27. *Id.*

28. *Id.*

29. *Id.* at 10.

30. Tr. IV, p. 73.

31. *See supra* proposition two.

32. Appellant's brief, Exhibit 2 at 22.

33. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

34. *Id.*

35. *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991); *Arizona v. Roberson*, 486 U.S. 675, 684, 108 S.Ct. 2093, 2099, 100 L.Ed.2d 704 (1988).

36. —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

37. *Id.* at ——, 114 S.Ct. at 2355.

**374**

of a desire for the assistance of an attorney"[38] are considered actual invocations of the right to counsel. If a suspect makes an ambiguous or equivocal reference to an attorney which a reasonable officer under the circumstances would have understood only as a possible invocation of the right to counsel, questioning need not cease.[39] While none of the accused's responses to police interrogation given **after** the purported invocation can be used to interpret the prior invocation,[40] all circumstances existing **prior** to the purported invocation can be used to help determine whether an accused unambiguously and unequivocally requested the presence of an attorney.[41]

In this case, Valdez gave a complete confession to the police before making the confusing statement he now contends invoked his right to counsel. He made that statement at the close of the interrogation and in response to Benson having asked him whether he had willingly signed the waiver of rights form and talked to the police. Considering the fact that Valdez had given a complete and uncounseled confession prior to making the statement, the interrogating officers could not have reasonably construed that statement to be a clear expression of a desire for the assistance of an attorney at all subsequent interrogations.

At most, Valdez's statement, read in context and in its entirety, was an ambiguous request for counsel. An ambiguous invocation of the Fifth Amendment right to counsel "do[es] not require the cessation of questioning."[42] Thus, neither Irwin's subsequent interrogation nor his trial testimony recounting parts of that interrogation violated Valdez's Fifth Amendment rights.

■ Valdez also argues that because he had been appointed counsel prior to Irwin's interrogation, Irwin violated his Sixth Amendment rights by initiating further conversation with Valdez without counsel present. Valdez's Sixth Amendment right to counsel attached when the Information was filed, which occurred the day before Irwin's interrogation.[43] At that point, officials were constitutionally forbidden to initiate further interrogation with Valdez **concerning the offense with which he had been charged.**[44] Unlike the Fifth Amendment *Miranda* right to counsel, the Sixth Amendment right to counsel is "offense-specific."[45] At the time of the Irwin interrogation, Valdez's Sixth Amendment right to counsel had attached **only** to the murder charge. Therefore, Irwin remained within constitutional boundaries when he approached Valdez concerning potential but as yet uncharged immigration violations.

■ The next question is whether the State remained within constitutional boundaries when it called Irwin to testify concern-

---

**38.** *McNeil v. Wisconsin,* 501 U.S. at 178, 111 S.Ct. at 2209.

**39.** Assessing these statements from an objective viewpoint "avoid[s] difficulties of proof and ... provide[s] guidance to officers conducting interrogations,...." *Davis v. United States,* —— U.S. at ——, 114 S.Ct. at 2355.

**40.** *Smith v. Illinois,* 469 U.S. 91, 97, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984). *See also Booker v. State,* 851 P.2d 544, 547 (Okl.Cr.1993).

**41.** *Smith v. Illinois,* 469 U.S. at 98, 105 S.Ct. at 494 (concluding that "[w]here nothing about the request for counsel **or the circumstances leading up to the request** would render it ambiguous, all questioning must cease.").

**42.** *Davis v. United States,* —— U.S. at ——, 114 S.Ct. at 2355.

**43.** *See Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (concluding that "a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"), *quoting Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion). Of course, the Sixth Amendment right attaches regardless of whether an accused specifically requests counsel. *Michigan v. Jackson,* 475 U.S. 625, 633, n. 6, 106 S.Ct. at 1404, 1409, n. 6, 89 L.Ed.2d 631 (1986).

**44.** *Michigan v. Jackson,* 475 U.S. at 632, 106 S.Ct. at 1408–09 (concluding that "the Sixth Amendment right to counsel at a postarraignment interrogation requires at least as much protection [per *Edwards v. Arizona* ] as the Fifth Amendment right to counsel at any custodial interrogation.").

**45.** *McNeil v. Wisconsin,* 501 U.S. at 175, 111 S.Ct. at 2207.

ing statements about the **homicide** which Valdez spontaneously made to Irwin during the **immigration** interview. Clearly, any evidence Irwin had obtained that "pertain[ed] to [possible immigration] charges as to which the Sixth Amendment right to counsel had not attached" would have been "admissible at **a trial of those offenses.**"[46] However, Valdez's Sixth Amendment right to counsel was, during Irwin's interrogation, firmly attached to the murder charge. Under *Edwards v. Arizona*, any statements Valdez made to Irwin concerning the murder charge were inadmissible at trial **unless** we find that Valdez reinitiated the conversation on that subject and thus waived his Sixth Amendment right to counsel.[47]

The rule set forth in *Edwards v. Arizona* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights...."[48] We have established that Irwin was free to initiate questioning of Valdez on the subject of Valdez's immigration status. Irwin's report reflects and Valdez does not contest that Irwin did in fact confine his questions to Valdez's immigration status. After Irwin finished his immigration questions, Valdez told Irwin he wanted to talk with a Spanish-speaking official to ensure that his account of the homicide was accurately interpreted. Irwin told Valdez he was not compelled to discuss the homicide and that Valdez's immigration status was acceptable. Upon Valdez's insistence, Irwin "allowed [Valdez] to offer his account of the events ... in question."[49]

Irwin did not badger Valdez into talking about the killing. While Irwin arguably presented Valdez with a comfortable environment in which to talk about that crime, he did not question Valdez about that crime. Irwin was not constitutionally prohibited from questioning Valdez about Valdez's immigration status, and he did not attempt to interrogate him about the murder charges.

Rather, **Valdez** initiated the exchange about the murder charges and thus waived his attached Sixth Amendment right to counsel when he made spontaneous and unsolicited remarks about the killing. These remarks were thus properly admitted at trial through Irwin's testimony. The arguments raised in this proposition are denied.

■ Valdez argues in his fourth proposition that the State presented insufficient evidence to prove him sane beyond a reasonable doubt. His theory is simply that his evidence of **insanity** was stronger and more believable than the State's evidence of **sanity.** Defense witness Dr. Phillip J. Murphy testified that Valdez did not know right from wrong at the time of the killing. Valdez claims Dr. Murphy spent a long time interviewing him, read all available police reports and spent time talking with other witnesses before reaching his conclusion. State witnesses Drs. Cecil F. Mynatt and Fernando Romero testified that Valdez knew right from wrong at the time he killed Barron. Valdez claims their conclusions were less credible because they were based upon cursory sanity evaluations. This argument is meritless.

■ Defendants facing criminal trials are presumed sane and must, therefore, bear the initial burden of placing their sanity in reasonable doubt.[50] Once the trial court determines that a defendant has met this burden, the presumption of sanity vanishes and the State bears the burden of proving beyond a reasonable doubt that the defendant did not suffer from a mental disease which would have rendered him incapable of either distinguishing between right and wrong or appreciating the nature and consequences of his acts.[51] The trial court in this case found that Valdez had established a reasonable doubt as to his sanity, and instructed the jury that it

**46.** *Id.* at 175, 111 S.Ct. at 2207–08 (emphasis added).

**47.** *Edwards v. Arizona,* 451 U.S. at 485, 101 S.Ct. at 1885.

**48.** *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990).

**49.** Appellant's brief, Exhibit 3 at 10.

**50.** *Kiser v. State,* 782 P.2d 405, 407 (Okl.Cr. 1989).

**51.** *Id. See also Johnson v. State,* 841 P.2d 595, 596 (Okl.Cr.1992).

could not convict him unless the State proved him sane beyond a reasonable doubt.[52]

The issue before us is whether the State presented sufficient evidence to meet this burden. Once the trial court makes the legal determination that the defendant has raised a reasonable doubt as to his or her sanity, the sanity issue becomes "a question of fact for the sole determination of the jury, ... [which] must consider all of the evidence presented, not merely the testimony of the expert witnesses...."[53] In reviewing the jury's conclusion, this Court "will [neither] inquire into the credibility of the witnesses nor weigh conflicting testimony."[54] Accordingly, we must uphold the jury's finding if there was sufficient evidence from which a rational trier of fact could have concluded that Valdez was sane when he murdered Barron.[55]

The evidence presented in this case supported the jury's conclusion that Valdez was sane when he killed Juan Barron. During its case in chief, the State elicited testimony from several witnesses who were with Valdez in the bar for several hours preceding the murder. One of these witnesses, Martin Orduna, actually observed the killing. All but Orduna testified that Valdez did not seem angry with Barron and appeared to be accepting and reciprocating Barron's homosexual advances. None of the witnesses, including Orduna, testified that Valdez was mentally unstable.

Valdez's first two witnesses were Drs. Mynatt and Romero. After examining Valdez for one hour, Dr. Mynatt, a psychiatrist, concluded that Valdez was not insane under the M'Naghten test. Valdez told him that he did not lose control on the night of the murder, but only wanted to show Barron the error of his ways. Valdez also told Dr. Mynatt that it was worse to be a homosexual than to kill one. Dr. Romero, a Mexican psychiatrist assisting Dr. Mynatt, described his interview with Valdez but did not at that time tell the jury whether he concluded Valdez was sane or insane at the time of the

murder. According to Dr. Romero, Valdez was calm and lucid during the interview. Valdez told Dr. Romero he might kill again if faced with the same circumstances.

Valdez then called his examining psychologist, Dr. Murphy. Dr. Murphy testified that he interviewed Valdez for almost five hours. After administering four tests, Dr. Murphy concluded that at the time of the killing Valdez was acting under the delusion that God was commanding him to reform Barron. At the time of the homicide, therefore, Valdez was unable to distinguish right from wrong or appreciate the nature and consequences of his acts. Dr. Murphy also characterized Valdez's illness as schizophrenia.

The State called Drs. Mynatt and Romero during rebuttal. Dr. Mynatt testified that the four tests used by Dr. Murphy in evaluating Valdez could not have assessed Valdez's mental condition as it had been twelve months earlier. He concluded Valdez was not schizophrenic, but testified that even if he were, he could still appreciate the difference between right and wrong. Dr. Mynatt testified he was uncomfortable giving an opinion on the issue of whether Valdez knew right from wrong on the night of the murder. However, Dr. Mynatt stated that based upon the available information, he would conclude that Valdez did know the difference between right and wrong and could appreciate the nature and consequences of his acts on that occasion. Dr. Romero testified Valdez knew right from wrong and appreciated the consequences of his acts on the night of the murder.

Valdez himself undermined Dr. Murphy's delusion theory when he testified that God did not command him to kill Barron, and that God did not command him to kill homosexuals. Valdez stated that certain passages of the Bible teach that homosexuals do not deserve to live. He testified he did not really know why he killed Barron, but that he did so when Barron refused to listen to Valdez's "sermon" denouncing homosexuality. Valdez

---

**52.** The trial court administered the four standard instructions, OUJI–CR 728–31.

**53.** *Kiser v. State*, 782 P.2d at 407.

**54.** *Id.*

**55.** *Id.*

testified he might kill another person who, like Barron, refused to listen to his teachings.

The jury heard testimony from witnesses who were with Valdez at the time of the crime, from the doctors who later evaluated Valdez's mental condition, and from Valdez himself. The jury concluded that the State had proven beyond a reasonable doubt that Valdez was sane when he committed the killing. After reviewing this evidence, we find that it supports the jury's conclusion. This proposition is denied.

In his fifth proposition, Valdez attacks the first degree heat of passion manslaughter instructions administered to the jury. He acknowledges that the trial court's instructions mirrored the uniform ones, but urges this Court to alter the definition of "adequate provocation" contained in those instructions.[56] In the current uniform instruction which was administered to the jury, "adequate provocation" is defined as

> any improper conduct of the deceased toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion **within a reasonable person in the position of the defendant**.... In determining whether the deceased's conduct was adequate provocation, the conduct is judged **as a person of reasonable intelligence and disposition would respond to it**.[57]

Valdez argues the instruction should be modified to allow a jury to consider a particular defendant's subjective state of mind when making the determination whether adequate provocation existed. We disagree.

Valdez claims that employing the subjective test of reasonableness would have allowed his jury to consider his alleged mental infirmities in determining whether he was adequately provoked and thus guilty of first

degree manslaughter rather than murder. He claims the jury in this case could not have found under the administered objective standard that he was adequately provoked and thus guilty of manslaughter rather than murder. Because the trial judge failed to also give a second degree murder instruction, he argues, the jury was left with no choice but to convict him of first degree murder. Valdez did not object to the instructions given and has thus waived all but plain error.

We have suggested that the "adequate provocation" necessary to reduce murder to manslaughter is "provocation which would cause a reasonable man to lose his normal self-control."[58] The Commission Comment to the Uniform Criminal Instructions also suggests that "the provocation [necessary to prove heat of passion must] be such as to induce passion in a reasonable person in the position of the defendant."[59] Neither Valdez nor the State cite any Oklahoma cases that have provided a more in depth discussion of whether adequate provocation should be measured by how a reasonable person or a person in the defendant's shoes would have reacted.

Valdez asserts as his only real basis for altering the instruction that in *Bechtel v. State*,[60] this Court recognized the problems with using the hypothetical "reasonable man" standard in self-defense cases. Valdez misconstrues *Bechtel*'s holding. *Bechtel* sanctioned the use of the "battered woman syndrome" in appropriate cases in which a defendant argues self-defense. We held that a modified version of OUJI–CR 743 (Defense of self-defense; justifiable use of deadly force), should be given "in all Battered Woman Syndrome cases."[61] The modified version of OUJI–CR 743 does not contain any reference to the terms "reasonable" or "reasonably," so that the factfinder may consider the

---

56. The "heat of passion" portion of first degree heat of passion manslaughter has four elements, one of which is "adequate provocation."

57. OUJI–CR 457 (emphasis added).

58. *Brown v. State*, 777 P.2d 1355, 1358 (Okl.Cr. 1989), *quoting* W. LaFave & A. Scott, Jr., *Substantive Criminal Law* § 7.10 at 252 (2d ed. 1986).

59. Commission Comment to OUJI–CR 457, p. 99.

60. 840 P.2d 1, 11 (Okl.Cr.1992).

61. *Id.*

defendant's actions "from the [subjective] standpoint of a reasonable battered woman." [62]

This Court did not, as Valdez claims, recognize inherent problems in using a reasonable person standard in all self-defense cases. Rather, we recognized that to give full effect to battered woman syndrome evidence in self-defense cases, instructions must require the jury to specifically consider how a battered woman would have reacted under the circumstances. In all other self-defense cases, OUJI–CR 743 is to be administered in its original form.

"The principle extenuating circumstance [in voluntary manslaughter cases] is the fact that the defendant, when he killed the victim, was in a state of passion engendered in him by an adequate provocation (i.e., a provocation which would cause a **reasonable man** to lose his normal self-control)." [63] Valdez does not raise any constitutional or other substantive challenge to this objective reasonable person standard by which Oklahoma law measures the adequacy of provocation necessary to reduce murder to manslaughter. We find this is the appropriate standard and thus deny Valdez's fifth proposition.

 For his sixth proposition, Valdez claims the trial court's failure to administer second degree murder and voluntary intoxication instructions denied him a fair trial. We note in response to Valdez's second degree murder instruction claim that a defendant is entitled to a lesser included offense instruction only when there is reasonable evidence to justify it. [64] The trial court must determine as a matter of law whether the evidence presented at trial is sufficient to justify an instruction on a lesser included offense. [65] Any doubt must be resolved in favor of administering the instruction. [66] The failure to give lesser included offense instructions supported by the evidence constitutes reversible error. [67] We must therefore first determine whether the evidence reasonably supported a second degree depraved mind murder instruction.

 The elements of second degree depraved mind murder are: 1) death of a human; 2) caused by conduct which was imminently dangerous to another person(s); 3) the conduct was that of the defendant; 4) the conduct evinced a depraved mind in extreme disregard of human life; 5) the conduct is not done with the intention of taking the life of or harming any particular individual. [68] The evidence in this case indicates Valdez's acts were intentionally, purposefully and indisputably directed toward Juan Barron. This evidence alone precluded a **sua sponte** instruction on the lesser included offense of second degree murder. [69]

 Valdez also claims that by failing to instruct the jury on second degree murder, the trial court failed to provide the jury with the option of convicting him of a non-capital offense as required by *Beck v. Alabama.* [70]

---

**62.** *Id.* at 11, n. 10.

**63.** Lafave & Scott, Jr., *Substantive Criminal Law, supra.*

**64.** *Hooks v. State,* 862 P.2d 1273, 1280 (Okl.Cr. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); *Fowler v. State,* 779 P.2d 580, 585 (Okl.Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990).

**65.** *Hooks v. State,* 862 P.2d at 1280.

**66.** *O'Bryan v. State,* 876 P.2d 688, 689 (Okl.Cr. 1994).

**67.** *Id.*

**68.** *Palmer v. State,* 871 P.2d 429, 432 (Okl.Cr. 1994).

**69.** *See Dennis v. State,* 561 P.2d 88, 94 (Okl.Cr. 1977) (finding second degree murder instruction inappropriate where "the defendant intended to shoot at the very persons whom he admitted shooting."). *Compare Boyd v. State,* 839 P.2d 1363, 1367 (Okl.Cr.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993) (finding second degree murder statute applicable where there was no premeditated intent to kill any particular person).

**70.** 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (declaring unconstitutional an Alabama statute prohibiting trial judges from giving juries in capital cases the option of convicting defendants of lesser, non-capital offenses supported by the evidence). *See also Schad v. Arizona,* 501 U.S. 624, 646, 111 S.Ct. 2491, 2505, 115 L.Ed.2d 555 (1991) (noting that the goal in *Beck* was to "eliminate the distortion of the factfinding process that is created when the jury is forced into

Valdez recognizes that his jury was given the option of convicting him of the non-capital offense of first degree manslaughter. He claims, however, that this option was meaningless: because Oklahoma requires the jury to assess the adequacy of provocation from an objective, reasonable person viewpoint and precludes consideration of the defendant's subjective mental state, the jury in this case could never have found that the evidence supported a manslaughter conviction.

Neither *Beck v. Alabama* nor *Schad v. Arizona* require that a jury in a capital case be given a third, non-capital option where the evidence absolutely does not support that option. The evidence in this case did not support a second degree murder instruction and the jury was thus properly precluded from considering that particular non-capital option. On the other hand, the evidence reasonably supported an instruction on the non-capital offense of first degree heat of passion manslaughter, and it was properly administered. Despite Valdez's attack on the standard by which that instruction measures the adequacy of provocation, there is no indication that this portion of the instruction absolutely prevented Valdez's jury from concluding that his act of killing constituted first degree heat of passion manslaughter rather than first degree malice aforethought murder. The jury in this case was free to find that a reasonable man in Valdez's position could have reacted the way he did. Accordingly, the jury in this case was not faced with the all-or-nothing, capital murder or

innocence choice condemned in *Beck v. Alabama*.

■ We next turn to Valdez's claim that the jury should have been instructed on the defense of voluntary intoxication, which could have shown a lack of criminal intent sufficient to reduce his murder conviction to manslaughter.[71] To be entitled to an instruction on the defense of voluntary intoxication, Valdez had to present evidence sufficient to raise a reasonable doubt concerning his ability to form the requisite criminal intent.[72] Had he met this burden, the trial court would have been required to administer the voluntary intoxication instruction even absent a request for it.[73]

Valdez failed to present evidence of intoxication sufficient to raise a reasonable doubt as to his ability to form a premeditated intent to kill Barron and was thus not entitled to an instruction on the defense of voluntary intoxication. Valdez did testify that he was "feeling drunk" at the time of the killing. He had at that time consumed approximately ten, 3.2 beers.[74] However, Valdez gave a detailed description of his actions on the night of the killing, including his conduct prior to the murder, the murder itself, and his conduct following the murder.[75] His ability to recount these details undermines his claim on appeal that he was so intoxicated at the time of the murder that he could not have formed the intent to kill.[76]

The witnesses who observed Valdez on the night of the killing also testified that he was not drunk. Miguel Rodriguez, who spent time with Valdez in the bar prior to the

an all-or-nothing choice between capital murder and innocence.").

71. *Crawford v. State*, 840 P.2d 627, 638 (Okl.Cr. 1992). *See also Hogan v. State*, 877 P.2d 1157, 1161 (Okl.Cr.1994).

72. *Fontenot v. State*, 881 P.2d at 83; *Crawford v. State*, 840 P.2d at 638.

73. *See Crawford v. State*, 840 P.2d at 638 (concluding that trial court has a duty to correctly instruct the jury on salient features of the law raised by the evidence without a request by the defense).

74. Dr. Murphy testified he had established that Valdez had consumed less than ten, 3.2 beers on the night of the murder. Valdez does not dispute

the fact that the beer was of 3.2 alcoholic content.

75. Further, Valdez's account of these events—especially of the murder itself—was substantially corroborated by the testimony of the other witnesses.

76. *See also Crawford v. State*, 840 P.2d at 638 (finding that "Appellant's detailed description of the burglary, robbery, larceny and surrounding circumstances demonstrate[d] that he was in control of his mental faculties and not in the advanced state of intoxication he attempt[ed] to assert.").

killing, testified Valdez did not appear to be drunk. Gustavo Rivera, who tended bar on the night of the murder, testified that Valdez did not seem that intoxicated. Alfonso Borjas, who was also with Valdez in the bar on the night of the murder, testified that he did not know whether Valdez was drunk. Martin Orduna, who was with Valdez in the bar and who later witnessed the killing, testified that Valdez was not drunk when they arrived at Valdez's house. Orduna specifically stated that Valdez was not "falling over or anything. He seemed to be conversing real well and walked all right." [77] This evidence did not warrant an instruction on the defense of voluntary intoxication. Accordingly, this argument and proposition six are denied.

◼◼◼◼ Valdez claims in proposition seven that the admission of improper other crimes evidence rendered his trial unfair. Orduna, the witness who saw Valdez kill Barron, testified that Valdez had told him Barron was not his first murder victim. Orduna testified that as a result of Valdez's statement, he thought "I guess I'm going to be the third [victim]." [78] Orduna's statement had been the subject of defense counsel's pretrial motion in limine which the trial court had granted. During the motion hearing, the prosecutor said he was unaware of this information and agreed that its admission could be prejudicial.

At trial, Orduna spontaneously made the remarks at issue during his narrative-style testimony. The State did not elicit them. While defense counsel immediately and successfully objected, the trial court did not grant Valdez's motion for mistrial or admonish the jury to disregard the remarks.[79] Valdez claims on appeal that the trial court

abused its discretion in failing to grant his motion for mistrial.

The evidence at issue was not, as the State argues, part of the **res gestae** of the murder. It was improper other crimes evidence and was clearly more prejudicial than probative. The question, therefore, is whether its admission warranted a mistrial. This error was preserved through defense counsel's timely objection and motion for mistrial. The burden is thus on the State to show that the admission error did not "result[ ] in a miscarriage of justice, or constitute[ ] a substantial violation of a constitutional or statutory right...." [80]

The State and defense presented conclusive evidence that Valdez killed Barron. Orduna's potentially prejudicial remark was not repeated, either through another witness's testimony or the State's closing argument. This improper testimony thus clearly did not contribute to the verdict.[81] While the remark could have undermined Valdez's insanity defense, he undermined it himself when he testified—in direct contravention of Dr. Murphy's insanity theory—that God did not command him to kill Barron, that God had not told him to kill homosexuals, that he did not feel sorry for Barron, and that Barron had gotten what was coming to him. The trial court's refusal to grant Valdez's motion for mistrial did not constitute an abuse of discretion. This proposition is denied.

◼◼ In his ninth proposition, Valdez claims the trial court's improper admission of a photo of the victim as he appeared in life requires reversal. During trial the State showed a picture of the victim to Barron's younger brother, Sammy, and asked him to identify it. After Sammy identified Barron's photo, defense counsel unsuccessfully object-

---

77. Tr. III, p. 157.

78. Tr. III, p. 167.

79. The trial court failed to admonish the jury to disregard the evidence and also failed to **sua sponte** instruct the jury about the proper use of "other crimes" evidence. The trial judge's failure to **sua sponte** administer the limiting instruction does not require automatic reversal. *See Jones v. State*, 772 P.2d 922, 925 (Okl.Cr.1989) (concluding that "the failure of a trial court to give a limiting instruction [on other crimes evi-

dence] **sua sponte** does not automatically constitute reversible error unless it arises to the level of plain error under 12 O.S.1981, § 2104(D).").

80. 20 O.S.1991, § 3001.1.

81. *See also Sattayarak v. State*, 887 P.2d 1326, 1331–32 (Okl.Cr.1994) (concluding that because State's case against murder defendant was overwhelming, error in improperly admitting other crimes evidence was harmless); *Douma v. State*, 749 P.2d 1163, 1166 (Okl.Cr.1988).

ed to its admission on the basis of improper foundation. Valdez argues on appeal that Barron's photograph had no probative value and was admitted only to garner jury sympathy. This Court has repeatedly held that when a specific objection is made at trial to the admission of evidence, no different objection will be considered on appeal.[82] Accordingly, this proposition will be reviewed for plain error only.

Photographs of homicide victims taken during life should be admitted to the jury only under very limited circumstances:

> Photographs of [homicide] victims [taken while alive] are inadmissible unless they are relevant to some material issue and their relevancy outweighs the danger of prejudice to the defendant.... [W]here there is no purpose in introducing such pictures into evidence, such admission invokes the sympathy of the jury and constitutes error.[83]

Barron's photograph was not relevant to any issue in the case against Valdez. While Barron's remains had been burned beyond recognition, no one questioned whether he was in fact Valdez's homicide victim. That the victim's identity was not an issue was evidenced by the fact that the prosecutor asked neither Valdez himself nor any of the witnesses to identify Barron's photograph. The trial court thus abused its discretion in admitting the photo of Juan Barron.[84] Given the overwhelming evidence against Valdez, however, we find that this error did not contribute to the verdict.[85] This proposition is denied.

## SENTENCING STAGE ISSUES

■ Valdez argues in proposition thirteen that his death sentence must be vacated because it was based upon unconstitutionally vague instructions defining the heinous, atrocious or cruel aggravator.[86] He claims the delimiting phrase describing "serious physical abuse" does not cure the unconstitutional vagueness of the initial definition of the terms "heinous, atrocious or cruel." We have determined that the instruction administered in this case meets constitutional standards, and have consistently denied the type of claims Valdez now makes.[87] This proposition is therefore denied.

■ In his fourteenth proposition, Valdez argues that the continuing threat aggravator[88] is being unconstitutionally applied. He acknowledges that this Court has consistently upheld the constitutionality of this aggravator.[89] However, he asks this Court to

**82.** *Wilson v. State,* 871 P.2d 46, 48 (Okl.Cr.1994). *See also Clayton v. State,* 840 P.2d 18, 28 (Okl.Cr. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993).

**83.** *Staggs v. State,* 804 P.2d 456, 458 (Okl.Cr. 1991). *See also Shelton v. State,* 793 P.2d 866, 870 (Okl.Cr.1990) (concluding that "[t]his Court does not encourage the use of photographs taken of victims before their demise and we caution prosecutors to first seek other forms of proof which are less prejudicial."); *Rawlings v. State,* 740 P.2d 153, 161–62 (Okl.Cr.1987) (finding that "[a]lthough this Court does not favor admissions of photographs showing the victim alive, we are of the opinion that the photograph was relevant as to *its existence and the location of its discovery.*"); *Boutwell v. State,* 659 P.2d 322, 326 (Okl. Cr.1983) (concluding photos showing victim while alive were not relevant because victim's identity was not at issue).

**84.** *See Rawlings v. State,* 740 P.2d at 160 (holding that trial court has discretion to determine whether probative value of photo outweighs prejudicial effect).

**85.** *See Hayes v. State,* 738 P.2d 533, 538–39 (Okl. Cr.1987) *vacated on other grounds in Hayes v.*

*Oklahoma,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988) (acknowledging the photograph's lack of probative value, this Court went on to conclude that its admission was harmless); *Boutwell v. State,* 659 P.2d at 326 ("[C]onsidering ... the overwhelming evidence against the accused, these [photographs of the victim taken while alive] would not have had the tendency to unduly prejudice the jury.").

**86.** 21 O.S.1981, § 701.12(4) ("The murder was especially heinous, atrocious, or cruel....").

**87.** *See Bryson v. State,* 876 P.2d 240, 259 (Okl.Cr. 1994); *Mayes v. State,* 887 P.2d 1288, 1319 (Okl. Cr.1994); *Fisher v. State,* 845 P.2d 1272, 1274 (Okl.Cr.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1993).

**88.** 21 O.S.1981, § 701.12(7) ("The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society....").

**89.** *See Malone v. State,* 876 P.2d at 715–16; *Trice v. State,* 853 P.2d at 220–21.

reconsider its position, arguing specifically that the aggravator is applied too broadly since it can be supported solely by evidence of the circumstances of the murder itself. Because Valdez had no prior documented history of criminal conduct, the State did in fact rely solely on the circumstances surrounding the murder to support the continuing threat aggravator.

Valdez does not claim that the evidence presented in his case was insufficient to establish the jury's finding of the continuing threat aggravator. He simply argues that as a matter of law the circumstances of the murder alone should not be capable of supporting this aggravator. This Court has consistently rejected Valdez's argument.[90] Accordingly, this proposition is denied.

█ Valdez claims in his twelfth proposition that his death sentence should be vacated because the great risk of death aggravator[91] is being applied unconstitutionally and because the evidence in this case was not sufficient to support it. This Court has consistently upheld the constitutionality of this aggravator, both as it is defined and as it is being applied.[92] Valdez raises no new theories that cause us to reexamine our conclusion.

█ We do, however, agree that the evidence in this case was insufficient to support the jury's conclusion that Valdez knowingly created a great risk of death to more than one person when he killed Barron. When reviewing the sufficiency of the evidence supporting an aggravator, this Court considers the evidence in the light most favorable to the State and asks whether it was competent to support the aggravator alleged.[93] Specifically regarding the great risk of death aggravator, this Court has held that "it is not the death of more than one person which supports [it], but the defendant's acts that create the risk of death to another which are in close proximity, in terms of time, location and intent to the act of killing itself."[94]

To prove the great risk of death aggravator in this case, the State argued in the Bill of Particulars that Valdez threatened to kill Orduna if [Orduna] interfered with the killing of Barron or refused to help him dispose of the body. At trial, Orduna testified that when he tried to stop Valdez from cutting Barron with the knife, Valdez asked Orduna if he wanted to die as well. Orduna testified that after Valdez had slit Barron's throat, he became scared. Valdez ordered Orduna to clean up the blood. Valdez also intimidated and scared Orduna by telling him that he (Valdez) had killed before. Orduna wanted to run to his car and leave, but testified he thought Valdez would shoot him if he tried to escape. To emphasize his desire that the killing be kept secret, Valdez also asked Orduna whether he wanted the same thing that happened to Barron [to] happen to him. During closing, the State reiterated Orduna's claim that Valdez threatened to kill him if he told anyone about the killing.[95]

Of the published cases to date in which this Court has found sufficient evidence to support the great risk of death aggravator, only four involved facts similar to those here—where the person found to have been at risk was not also injured.[96] Even these four fac-

**90.** *See Malone v. State,* 876 P.2d at 718, n. 10.

**91.** 21 O.S.1981, § 701.12(2) ("The defendant knowingly created a great risk of death to more than one person....".)

**92.** *See Malone v. State,* 876 P.2d at 716; *Snow v. State,* 876 P.2d 291, 299 (Okl.Cr.1994); *Trice v. State,* 853 P.2d at 219.

**93.** *Bryson v. State,* 876 P.2d at 259. *See also Malone v. State,* 876 P.2d at 717 (concluding that this Court will independently review the evidence supporting the aggravator at issue to determine its sufficiency).

**94.** *Snow v. State,* 876 P.2d at 297.

**95.** On appeal, Valdez argues that Orduna's testimony should be discounted because it was untrue. Valdez attached an affidavit from Victor Chevere who was in the Grady County jail with Orduna and Borjas during the time they were being held as material witnesses in this case. Chevere claims he overheard Borjas tell Orduna that he "must tell the authorities Mr. Valdez threatened his life and made Orduna help him dispose of the evidence or the authorities would charge Orduna as a participant in the crime." Appellant's Brief, Exhibit 4.

**96.** In the following cases, the endangered bystanders who suffered a great risk of death were either in the line of the defendant's fire or were contemporaneously injured or actually killed by

tually similar cases are critically different from Valdez's, because the defendants in those cases seriously considered killing people other than the actual victims.[97]

the defendant. *See Neill v. State*, 896 P.2d 537 (Okl.Cr.1994) (defendant killed three people during bank robbery); *McCracken v. State*, 887 P.2d 323 (Okl.Cr.1994) (defendant shot four victims during robbery); *Walker v. State*, 887 P.2d 301 (Okl.Cr.1994) (defendant stabbed to death his girlfriend and her uncle); *Malone v. State*, 876 P.2d 707 (defendant opened fire on homicide victim while two men stood nearby on porch, several people sat inside talking and children played outside); *Snow v. State*, 876 P.2d 291 (defendant killed victim in private cubicle, but attacked and stabbed victim's husband when he came there looking for her); *Long v. State*, 883 P.2d 167 (Okl.Cr.1994) (defendant brutally and simultaneously stabbed to death a mother and her son); *Ellis v. State*, 867 P.2d 1289 (Okl.Cr. 1992) (at initial crime scene, defendant shot three people, one fatally and one critically; at subsequent crime scene, defendant killed two more people and shot two more people); *Paxton v. State*, 867 P.2d 1309 (Okl.Cr.1993) (defendant shot three people at close range in a small house, fatally injuring one and continuing to pursue the remaining two); *Trice v. State*, 853 P.2d 203 (Okl.Cr.1993) (defendant raped and bludgeoned to death an elderly woman, and also beat her retarded son so severely that he eventually lost an eye); *Stafford v. State*, 832 P.2d 20 (Okl.Cr. 1992) (defendant shot and killed a family of three when they stopped to help him with his car); *Stout v. State*, 817 P.2d 737 (Okl.Cr.1991) (defendant killed his sister and her husband); *Sellers v. State*, 809 P.2d 676 (Okl.Cr.1991), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991) (defendant killed his parents as they lay sleeping in their bed); *Fox v. State*, 779 P.2d 562 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990) (defendant murdered three grocery employees in back room of the store—*see also* codefendant's case *Fowler v. State*, 779 P.2d 580 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990)); *Nguyen v. State*, 769 P.2d 167 (Okl.Cr. 1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989) (defendant killed woman and two small children in different rooms of same house); *Stouffer v. State*, 738 P.2d 1349 (Okl.Cr.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988) (defendant shot two people, one fatally, in different parts of same house); *Bowen v. State*, 715 P.2d 1093 (Okl.Cr. 1984), *cert. denied*, 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660 (1985) (defendant shot and killed three men as they left party); *Cartwright v. State*, 695 P.2d 548 (Okl.Cr.1985), *modified on other grounds in Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (defendant entered couple's home, shot woman in leg and throat and fatally shot her husband); *Stout v. State*, 693 P.2d 617 (Okl.Cr.1984), *cert. denied*, 472 U.S. 1022, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985) (defendant beat two people to death); *Robison v. State*, 677 P.2d 1080 (Okl.Cr.1984), *cert.*

denied, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984) (defendant murdered three people who were in the same house); *Dutton v. State*, 674 P.2d 1134 (Okl.Cr.1984) (defendant fatally shot one victim during robbery, and also shot the victim's mother); *Stafford v. State*, 665 P.2d 1205 (Okl.Cr.1983), *vacated on other grounds in Stafford v. Oklahoma*, 467 U.S. 1212, 104 S.Ct. 2651, 81 L.Ed.2d 359 (1984) (defendant executed six restaurant workers); *Davis v. State*, 665 P.2d 1186 (Okl.Cr.1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983) (defendant shot and killed two people and wounded two others); *Jones v. State*, 648 P.2d 1251 (Okl.Cr.1982), *cert. denied*, 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002 (1983) (defendant killed one victim, shot and critically injured two others); *Chaney v. State*, 612 P.2d 269 (Okl. Cr.1980), *cert. denied*, 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981) (defendant murdered two women).

**97.** In the first of those four, the homicide victim was a woman who was shot in her home in the middle of the night. Her husband awoke, saw her fall to the living room floor, rolled out of bed and grabbed his gun. The defendant shot three times into the empty bed. This Court found the defendant created a great risk of death to more than one person when he shot at the empty bed. *Brecheen v. State*, 732 P.2d 889, 898 (Okl.Cr. 1987), *cert. denied*, 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 244 (1988), *overruled on other grounds in Brown v. State*, 871 P.2d 56 (Okl.Cr. 1994). The victim in the second case was choked, stabbed and eventually shot to death. The defendant ordered some acquaintances who witnessed the killing to clean up and keep quiet. There was evidence that the defendant would have shot these bystanders had they not cooperated with her. This Court found the defendant knowingly placed these bystanders in great risk of death. *Smith v. State*, 727 P.2d 1366, 1373 (Okl.Cr.1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). In the third case, the defendant threatened to shoot a clerk if she did not cooperate with him. This Court found that the defendant's act of shooting and killing a nearby policeman showed his willingness to carry out his threat to the clerk, thus placing her in great risk of death. *Ross v. State*, 717 P.2d 117, 123 (Okl.Cr.1986), *affirmed*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). In the fourth case with facts similar to those in Valdez's, the defendant had shot and killed a man. Shortly thereafter, while the defendant was leaving, some teenagers in a car yelled at and taunted him. The defendant pulled out his gun and pointed it at the teenagers, causing them to run a red light in an effort to escape. This Court held that the defendant had knowingly placed the teenagers in great risk of death. *Hays v. State*, 617 P.2d 223 (Okl.Cr.1980).

In this case, Orduna, the eyewitness, had known Valdez for about three years. While Orduna did witness Valdez commit a horrible and frightening act, he also seemed to understand that Valdez's anger was directed toward Barron and not him. Assuming Orduna was telling the truth when he testified that Valdez had threatened to kill him if he did not help Valdez dispose of Barron's body, the question is whether Valdez thereby knowingly placed Orduna in **great** risk of death. After evaluating the great risk of death evidence in this case and comparing it to that presented in comparable cases, we conclude that he did not and that the evidence was thus insufficient to support the jury's finding.[98]

▇▇ Having concluded that the evidence was insufficient to support the great risk of death aggravator, we must reweigh the remaining two valid aggravating circumstances against the mitigating evidence to determine whether Valdez's death sentence can stand.[99] We must vacate the death sentence unless we can conclude beyond a reasonable doubt that the jury would have imposed it absent the now invalid great risk of death aggravator.[100]

The two remaining valid aggravators are 1) that the murder was especially heinous, atrocious or cruel and 2) that Valdez will pose a continuing threat to society. The evidence of extreme cruelty or serious physical abuse supporting the heinous, atrocious or cruel aggravator came from eyewitness testimony describing Barron's final hours of life, as well as from Valdez's own testimony. Orduna testified that Valdez forced Barron to strip and began beating him with his fists. Valdez then shot Barron twice in the forehead. Barron did not immediately die, but kept struggling with Valdez and repeating "Oh my God." Valdez then struck Barron on the side of the head with his gun. Valdez testified he noticed that Barron was still breathing, so he retrieved a knife and cut Barron's throat. According to Orduna, Barron shook and then died.

The State argued in support of the continuing threat aggravator that the murder of Barron was senseless and callous, and that Valdez had shown no remorse for what he had done. Some of the additional evidence supporting the continuing threat aggravator came from Valdez's own testimony. Valdez testified that Barron got what was coming to him, and that he might repeat his acts if again faced with the same circumstances.

First stage mitigating evidence included testimony that Valdez suffered from mental problems and that he was under a delusion when he killed Barron. The defense presented two mitigation witnesses during the second stage of trial. Delfena Valdez, Valdez's mother, testified that her son had never been a fighter, but had been a peace loving person. Maria, Valdez's wife of thirteen years, testified that the couple had three children, that she had never known her husband to be a violent person, and that she did not want the State to put him to death. Second stage jury instruction No. 7 informed the jury that evidence had been presented to support the following mitigating circumstances: that as both a child and an adult, Valdez might have suffered from physical and mental problems; that he had cooperated with law enforcement officials; that he had consumed alcohol before committing the killing; that he was religious; that he had a wife and three children; that he had no prior history of violence; that he had a steady job; that he was not a drifter or transient; that he was a family man; and, that he had been truthful.

The evidence presented in support of the heinous, atrocious or cruel and continuing threat aggravators was compelling. Conversely, the record's potential mitigating evidence was insubstantial. After carefully and

98. Part of Orduna's testimony included improper other crimes evidence concerning a possible murder Valdez had previously committed. This was used to support the great risk of death aggravator. Though we have determined that this admission error did not affect the jury's verdict, it may have bolstered an otherwise weak case for the great risk of death aggravator.

99. *Snow v. State,* 876 P.2d at 299; *Trice v. State,* 853 P.2d at 221; *Stout v. State,* 817 P.2d 737, 738 (Okl.Cr.1991).

100. *Snow v. State,* 876 P.2d at 299.

independently reweighing the two valid aggravating circumstances against the mitigating evidence, we conclude beyond a reasonable doubt that the jury in this case would have sentenced Valdez to death even if it had not considered the invalid great risk of death aggravator.[101]

█ Valdez argues in proposition fifteen that because the jury was precluded from considering first stage evidence during the second stage of trial, the evidence was insufficient to prove the three alleged aggravators. At the beginning of the sentencing phase, the State moved to incorporate the first stage evidence into the second stage of trial. The trial judge granted this motion and orally advised the jury that it would be "allowed to consider the testimony that was previously given at the guilt or determination of guilt phase of the trial ... just completed."[102] However, sentencing phase instruction No. 12 informed the jury that in making its sentencing determination, it could "consider only the evidence received here in open court presented by the State and the defendant during the **sentencing phase** of this proceeding."[103]

Valdez claims the jury could have interpreted these allegedly contradictory instructions to mean that it could not consider any of the first stage evidence when making its determination regarding the existence of the three aggravators. He then claims that because of these confusing instructions, none of the first stage evidence necessary to prove the three aggravators ever made it into the second stage of the trial—thus rendering the evidence insufficient to support those aggravators. Valdez failed to object to the trial court's instruction and thus waived all but plain error.

We addressed this same contention in *Long v. State*,[104] and concluded that the written instruction did not conflict with the trial court's oral instruction: "[t]he jury was limited in its [sentencing] consideration to [second stage] matters **presented in open court**."[105] There is no indication in this case that the jury was confused during the sentencing phase, especially considering the fact that it found sufficient evidence to support all three alleged aggravators. This proposition is denied.

█ Valdez argues in proposition sixteen that the first stage anti-sympathy instruction incorporated into the sentencing phase prevented the jury from fully and effectively considering his mitigation evidence. We have consistently rejected this argument.[106] This proposition is denied.

█ In proposition seventeen, Valdez claims the second stage instructions administered in this case were constitutionally flawed because they failed to make clear to the jurors that they did not have to unanimously agree on the existence of mitigating evidence before they could consider it. This Court has consistently rejected this argument, concluding that current instructions meet Supreme Court standards because they do not unconstitutionally prevent the jury from considering a defendant's mitigating evidence.[107] This proposition is denied.

█ For his eighteenth proposition, Valdez claims the trial court erred in failing to tell the jury it had the option of returning a life sentence regardless of its findings on aggravating and mitigating evidence. We have consistently held that defendants are not entitled to an instruction on "jury nullification."[108] This proposition is therefore denied.

101. *See Snow v. State*, 876 P.2d at 300. *See also McGregor v. State*, 885 P.2d 1366, 1387 (Okl.Cr. 1994).

102. Tr. V, p. 166.

103. O.R. 244 (emphasis added).

104. 883 P.2d at 176.

105. *Id.* (Emphasis added).

106. *See Mayes v. State*, 887 P.2d at 1319; *Revilla v. State*, 877 P.2d 1143, 1153 (Okl.Cr.1994); *Trice v. State*, 853 P.2d at 216.

107. *See Mayes v. State*, 887 P.2d at 1319–20; *Bryson v. State*, 876 P.2d at 262; *Carter v. State*, 879 P.2d 1234, 1252, n. 14 (Okl.Cr.1994).

108. *See Bryson v. State*, 876 P.2d at 262–63; *Pickens v. State*, 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); *Romano v. State*, 847 P.2d

## PROSECUTORIAL MISCONDUCT ISSUES

■ In his eighth proposition, Valdez claims that numerous instances of prosecutorial misconduct rendered his trial unfair. We disagree. Valdez first claims the prosecutor introduced inadmissible "other crimes" evidence. He initially attacks the admission of Orduna's statement concerning a prior murder which Valdez may have committed. We addressed this error in proposition seven and concluded that it did not contribute to the verdict. Valdez next attacks the prosecutor's elicitation of testimony showing that Valdez may have taken the victim's social security card before burning the body. It appears the prosecutor elicited this testimony in order to refute Valdez's insanity defense and not to show that Valdez had committed a theft. In light of the overwhelming evidence of guilt in this case, any possible effect this evidence may have had on the jury was inconsequential.

■ Secondly, Valdez claims the prosecutor exceeded the bounds of proper conduct when he showed Valdez the murder weapons (gun and knife) and asked him to demonstrate how he had used them to kill Juan Barron. Defense counsel did object, albeit unsuccessfully, when the prosecutor asked Valdez to look at the gun, stating "We don't want him having the gun in his hand." [109] Valdez complied with the prosecutor's requests and apparently demonstrated to the jury what he had done to Barron.

The prosecutor acted improperly in requesting that Valdez reenact the murder for which he was on trial. Even if such a reenactment were remotely relevant, the potentially prejudicial effect this might have had on the jury should have precluded its admission.[110] Considering the fact that Valdez

gave an extrajudicial confession to the killing and then recounted the details once again from the witness stand, it is clear that the prosecutor's misconduct did not contribute to the jury's finding that Valdez indeed committed the acts for which he was on trial.[111] Therefore, it does not appear the prosecutor's error undermined Valdez's case or deprived him of the right to a fair trial.

■ Third, Valdez claims the prosecutor misstated the evidence and argued facts that were not supported by the evidence. He first points to the prosecutor's statement, during first stage closing, that Valdez had beaten Barron with a rope and had taken two hours to kill him. Because defense counsel did not object to this portion of the prosecutor's argument, we will review this claim for plain error only.[112]

The evidence did not support the prosecutor's conclusion that Valdez had beaten Barron with a rope. Given the overwhelming evidence of guilt, however, this minor misinterpretation error was harmless. Further, the prosecutor told the jurors at the beginning of his statement that if any discrepancy existed between the facts he argued and the facts as they remembered them to be, they should rely on their memory.

■ Concerning the prosecutor's statement that Valdez took "about an hour and probably two" [113] to kill Barron, this comment seems hardly a factual misrepresentation given the rather inconclusive evidence. Orduna testified that the three men arrived at Valdez's residence at about 3:00 or 3:30 a.m., and that Valdez and Orduna left at about 6:00 a.m. Neither Valdez's nor Orduna's testimony revealed exactly how much time passed between their arrival and Barron's death. While testimony from both Val-

---

368, 392 (Okl.Cr.1993), *affirmed, Romano v. Oklahoma,* 512 U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

109. Tr. V, p. 91.

110. *See e.g., Ford v. State,* 719 P.2d 457, 460 (Okl.Cr.1986) (modifying fifty-year sentence to twenty-five after concluding that the prosecutor's demand during cross-examination that defendant pick up the murder weapon and show how he used it "is not to be condoned.").

111. While this misconduct might have affected the jury's refusal to find Valdez insane, Valdez's own testimony further weakened his rather insubstantial insanity defense.

112. *See Carter v. State,* 879 P.2d at 1252–53; *Trim v. State,* 808 P.2d 697, 699–700 (1991).

113. Tr. V, p. 153.

dez and Orduna did suggest that the killing took place within an hour after they arrived at Valdez's house, the time frame remains sketchy. Even assuming the prosecutor did incorrectly suggest that it took Valdez close to two hours to kill Barron, this comment was not met with an objection and is thus subject only to plain error review. It appears any possible error did not contribute to the verdict.[114]

▮ As part of his factual misrepresentation argument, Valdez claims that the Bill of Particulars—read to the jury during second stage—made it sound as if Barron had been alive when Valdez burned him. In the paragraph describing the evidence supporting the heinous, atrocious or cruel aggravator, the bill describes the shooting and throat slitting and then states that Valdez subsequently incinerated the victim's body into ash. This is not a misstatement, since it clearly explains that the burning was not of Barron but of his body. Further, while evidence of the post-mortem body burning did not support the heinous, atrocious or cruel aggravator, the record reflects that the prosecutor did not attempt to use this evidence to bolster this aggravator.

Fourth, Valdez claims the prosecutor badgered and denigrated him during cross-examination. Defense counsel failed to object to these allegedly denigrating comments, thus waiving all but plain error review. We find no plain error.

Lastly, Valdez claims the prosecutor used tactics during both stages of trial that were intended to elicit sympathy for the victim. Once again, there was no contemporaneous objection to these alleged tactics, and we do not find that they constituted plain error. None of the preserved or unpreserved instances of alleged prosecutorial misconduct in this case were so flagrant that they de-

prived Valdez of his right to a fair trial.[115] This proposition is therefore denied.

### INEFFECTIVE ASSISTANCE OF COUNSEL ISSUES

In his tenth proposition, Valdez claims his trial counsel was so ineffective that his performance undermined the reliability of Valdez's conviction and sentence. "Appellate review of an ineffective assistance of counsel claim begins with a presumption of competence, and the burden is upon the defendant to demonstrate both a deficient performance and resulting prejudice." [116] The ultimate test is whether, but for the allegedly deficient performance, the result of the trial would have been different.[117] Since Valdez is claiming that ineffective assistance of counsel contributed to his sentence of death as well as to his murder conviction, this Court must also determine "whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." [118]

▮ Valdez first claims his trial counsel was ineffective because he failed to challenge the State expert's finding of competency. He provides a list of many questions defense counsel failed to ask State's expert Dr. Quinn regarding his determination that Valdez was competent to stand trial. It is clear defense counsel was not required to follow any particular checklist when questioning Dr. Quinn about his evaluation of Valdez. Even absent Valdez's suggested questions, the record contained sufficient evidence from which the trial court and this Court could determine that Valdez possessed sufficient present ability to consult with his lawyer and a rational as well as factual understanding of the proceedings against him. We determined in proposition one that the trial court did not abuse its

**114.** See *Allen v. State,* 871 P.2d 79, 96 (Okl.Cr. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994).

**115.** See *Freeman v. State,* 876 P.2d 283, 287 (Okl.Cr.1994) (concluding that a conviction will not be reversed as a result of prosecutorial misconduct unless the comments were so flagrant that they prejudiced the defendant).

**116.** *Fontenot v. State,* 881 P.2d at 86. *See also Strickland v. Washington,* 466 U.S. 668, 687–89, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984).

**117.** *Id.* at 694, 104 S.Ct. at 2068. *See also Lockhart v. Fretwell,* 506 U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

**118.** *Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. at 2069.

discretion in concluding that Valdez was competent to stand trial. Even if defense counsel did not conduct an overwhelmingly comprehensive interrogation of Dr. Quinn on the issue of Valdez's competency, there is not a reasonable probability that had he done so the result of the proceeding would have been different.[119]

◼ Secondly, Valdez claims defense counsel was ineffective because he failed to file a motion to suppress Valdez's confessions, failed to request a *Jackson–Denno* hearing on the voluntariness of the confessions, and failed to request instructions explaining admissions standards for extra-judicial confessions. We concluded in propositions two and three that Valdez's extra-judicial confessions were properly obtained. Accordingly, defense counsel's failure to file a motion to suppress them did not prejudice Valdez. Defense counsel's failure to subsequently request a *Jackson–Denno* hearing did not constitute ineffectiveness, because the evidence did not present a question of whether Valdez voluntarily confessed. Finally, defense counsel was not ineffective in failing to request that the jury be given the "voluntary custodial confession" instruction: because there was no issue as to whether Valdez's confessions had been voluntary, the jury was rightly precluded from considering this matter.

Thirdly, Valdez claims defense counsel was ineffective because he failed to request instructions on second degree murder and voluntary intoxication. We concluded in proposition six that the evidence did not support either of these instructions. Defense counsel's failure to request them did not, therefore, constitute ineffective assistance.

◼ Fourthly, Valdez claims defense counsel was ineffective because he failed to investigate and present testimony to rebut the State's evidence supporting the three alleged aggravators. The fact that a defense attorney could have investigated an issue more thoroughly does not, in and of itself, constitute ineffective assistance.[120] Victor Chevere, who was in jail with Borjas and Orduna prior to Valdez's trial, allegedly overheard the two men discussing their impending testimony. In an affidavit attached to Valdez's brief, Chevere states Borjas told Orduna that to avoid prosecution, he had to testify that Valdez made him help dispose of Barron's body. While Valdez claims defense counsel was ineffective in failing to call this available witness who might have helped rebut the State's "great risk of death" evidence, he presents no evidence to show that defense counsel knew of Chevere at the time of trial. This claim does not support a conclusion that defense counsel's performance was deficient.[121]

◼ Fifth and finally, Valdez claims defense counsel was ineffective because he failed to object to numerous instances of prosecutorial misconduct. In proposition eight, we reviewed the alleged instances of prosecutorial misconduct and determined that none of the arguably improper tactics were so flagrant that they deprived Valdez of his right to a fair trial. Defense counsel's failure to object to improper but nonprejudicial prosecutorial trial tactics did not constitute ineffective assistance.

Defense counsel's performance in this case did not "so undermine[ ] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[122] Even if defense counsel failed to object to some instances of prosecutorial mis-

119. *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.

120. *Williamson v. State*, 812 P.2d 384, 413 (Okl. Cr.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992); *Boltz v. State*, 806 P.2d 1117, 1126 (Okl.Cr.1991), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). *See also Dutton v. Brown*, 812 F.2d 593, 598 (10th Cir.1987) (holding that a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time).

121. This issue has been rendered moot by this Court's determination that there was insufficient evidence to support the great risk of death aggravator.

122. *Strickland v. Washington*, 466 U.S. at 686, 104 S.Ct. at 2064.

conduct, any error did not influence the jury's decision to impose the death sentence. This proposition is therefore denied.

### MANDATORY SENTENCE REVIEW

In accordance with our statutory duty, we must now determine (1) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the alleged statutory aggravating circumstances.[123] We are satisfied that neither passion, prejudice nor any other arbitrary factor contributed to the jury's sentencing determination. After carefully considering the evidence presented, we also find that it amply supported the jury's finding of the heinous, atrocious or cruel and continuing threat aggravators.

Finding no error warranting reversal or modification, the Judgment and Sentence of the trial court is **AFFIRMED.**

JOHNSON, P.J., and LANE and STRUBHAR, JJ., concur.

LUMPKIN, J., concurring in results.

LUMPKIN, Judge, concurring in results.

I concur in the affirmance of the first degree murder conviction and the imposition of the death penalty. However, I find the Court's vacating of the "great risk of death to more than one person" aggravating circumstance is not supported by the facts or prior case law.

In *Smith v. State*, 727 P.2d 1366, 1373 (Okl.Cr.1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987) and *Hays v. State*, 617 P.2d 223, 231 (Okl.Cr.1980), this Court upheld the aggravator under similar circumstances wherein the defendant pointed a gun in a threatening manner at bystanders.

Further, statements by Appellant that he had previously committed murder should be considered as evidence supporting this aggravator. The statements were not introduced as evidence of another crime, but were so closely related to the murder as to be admissible as part of the res gestae of the offense. In fact, the statements are direct evidence of his intent and the "great risk of death to more than one person" aggravator.

In footnote 95 the Court refers to an affidavit from an inmate in the Grady County Jail with Orduna. This ex-parte affidavit, obtained after trial and attached to Appellant's brief, is not a proper part of the record on appeal and should play no part in our review of the case. This Court should restrict its review to the record created through the trial court proceedings or matters properly added through the prescribed supplementation process set out in Rule 3.11 of this Court's rules.

Further, in reviewing Appellant's claim that the trial court's determination of his competency violated due process, the opinion reviews for plain error only. I agree with that scope of review but base that decision on this Court's decision in *Simpson v. State*, 876 P.2d 690, 694-695 (Okl.Cr.1994). This Court should use its own case law where applicable rather than referring to federal law as this Court has the ability to apply our evidence code differently than the federal courts. The scope and method of plain error review was set out in *Simpson.*