Bryan Anthony TOLES, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–94–1145.

Court of Criminal Appeals of Oklahoma.

Aug. 22, 1997.

Rehearing Denied Dec. 1, 1997.

Stephen Hess, Mike Wilson, Oklahoma Indigent Defense System, Norman, Defense Counsel at trial.

Robert Schulte, District Attorney, Keith Aycock, Assistant District Attorney, Lawton, Prosecutor at trial.

Jamie D. Pybas, Oklahoma Indigent Defense System, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, Robert Whitaker, Assistant Attorney General, Oklahoma City, for the State on appeal.

## OPINION

LANE, Judge:

Bryan Anthony Toles, Appellant, was tried by jury for the crimes of Murder in the First Degree (Counts I and II) (21 O.S.1991, § 701.7(A)); Conspiracy to Commit Robbery After Former Conviction of a Felony (Count V) (21 O.S.1991, § 421); Attempted Robbery with Firearm (Count VI) ( 21 O.S.1991, § 797); and Possession of a Weapon After Former Conviction of a Felony (Count VII) (21 O.S.1991, § 1283) in Comanche County District Court Case No. CRF–93–241. The jury acquitted Toles of Count VI and returned guilty verdicts on each of the other counts.

The jury found four aggravating circumstances: 1) the defendant knowingly created a great risk of death to more than one person; 2) the murder was especially heinous, atrocious or cruel; 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 4) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(2), (4), (5), (7). The jury then recommended a

sentence of death on each of the murder counts, twenty years imprisonment for the conspiracy, and ten years imprisonment for the possession of a weapon after former conviction of a felony. The trial court imposed each of the recommended sentences. Mr. Toles has perfected his original appeal to this Court, and we affirm judgment and sentence.

## FACTS

The events which culminated in the murder of Juan Franceschi and his fifteen year old son, Lonnie, began shortly after midnight on July 16, 1993. Bryan Toles, David Flowers and Casey Young walked past the Franceschi home in Lawton and decided to steal a car. The men were on their way from the Honeymooners Bar to the home of their friend, Herbie Foster, and they were tired of walking. None of them knew how to hotwire the red Mustang 5.0 in the Franceschi's driveway, so they had to get the keys.

Toles rang the doorbell while Young and Flowers hid around the corner and put bandannas over their faces outlaw-style. Young had already loaded a .22 revolver and given it to Toles.

Toles pushed his way into the home when Lonnie opened the door. He pointed the pistol at Lonnie and told him to get down and shut up. Young and Flowers went down the hall toward the bedrooms. Norma Franceschi heard the commotion and met them in the hall. She screamed for her husband and continued toward the front door. Juan Franceschi struggled briefly with Young and Flowers in the hall and joined his wife. Toles, who had been kicking Lonnie, shot Juan Franceschi in the arm.

Toles followed Mr. and Mrs. Franceschi as they retreated toward the bedroom. He aimed at Mr. Franceschi's head, but before he could fire, Mrs. Franceschi grabbed his arm. Thinking that Mr. Franceschi could identify him, and that he "might as well go ahead and kill him," Toles aimed at Franceschi's chest and shot. Even though he was shot, Franceschi fought with Toles in the hallway. Toles' pants became soaked with Franseschi's blood during the fight. Mrs. Franceschi escaped to their grown daugh-

ter's bedroom, hiding first in the closet, and then in the drawer of a waterbed. She heard someone come into the room and leave.

Meanwhile Lonnie Franceschi was still kneeling on the floor near the front door with his hands behind his back. Toles saw Lonnie on his way out of the house and thought, "damn, there's still him left." Realizing Lonnie could identify him, Toles turned, extended his arm so the barrel of the pistol was about six inches from the back of Lonnie's head, and fired.

After Toles, Young and Flowers left, Lonnie went to his bedroom and got in bed. His mother heard him crying and gasping for air. When she tried to call 911 from the back bedroom, she discovered the phone was dead and ran to a neighbor's home to call. Paramedics arrived shortly and placed Lonnie on life support. Juan Franceschi died while the paramedics worked on him. Later that day Lonnie was declared brain dead, removed from life support and allowed to die.

After they left the Franceschi home, Toles, Young and Flowers walked two blocks to the home of a friend who gave them a ride to Herbie Foster's. Toles gave his bloody clothes to a runaway girl who was staying there and told her to burn them. He called a family friend and told her and her boyfriend that he shot two people. He then spent the night at the home of another friend. He was arrested later that afternoon while he was talking to his mother on a pay phone at the corner of 17th Street and Gore in Lawton.

## SUFFICIENCY OF THE INFORMATION

■ Toles was charged with first degree, malice aforethought murder by Information which used the term "premeditated design." He asserts in his first proposition of error the Information is fatally defective for the term "malice aforethought" must be used to charge malice murder. Toles argues his case is controlled by *Pickens v. State*, 885 P.2d 678, 683–84 (Okl.Cr.1994), *overruled on other grounds by Parker v. State*, 917 P.2d 980 (Okl.Cr.1996). In that case the charging paragraph contained the language "premeditated design" as well as language associated with felony murder. As a result the charg-

ing paragraph did not clearly charge either felony murder or malice aforethought murder. This defect was fatal.

Careful reading of *Pickens* makes clear the term "premeditated design" does not, in itself, create a defect. The *Pickens* defect was the irreconcilable confusion as to what crime was charged. No confusion as to the crime charged exists in the Information filed in Mr. Toles' case. The meaning of the charging paragraph is clear—it charges Toles with malice aforethought murder. There is no error here.

## JURY SELECTION

Toles raises two issues concerning the removal of veniremen for cause in his fifth proposition of error. He claims the trial court erred by removing venireman Pacheo, and by not removing venireman Pyles.

■ Removal for cause is proper when a venireman is unable to perform the duties of a juror in accordance with the court's instructions and the jurors' oath. *Knighton v. State*, 912 P.2d 878, 885 (Okl.Cr.1996); *See Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Venireman Pacheo told the court, "... I don't think that—I don't want the responsibility of having to decide whether someone lives or dies." The trial judge asked whether it was "too awesome of a responsibility" for him, and he replied, "For me, personally." The prosecutor asked, "Are there any circumstances under which you would give the death penalty in a murder first case?", and he replied, "I don't know. It's just a decision that I really do not want to have to make...." The prosecutor asked whether he could agree to a verdict imposing the death penalty without doing violence to his conscience, and he replied, "No." The trial court then removed him for cause.

Toles seizes the "violence to the conscience" language to argue venireman Pacheo was removed under an unconstitutionally low standard for mere conscientious objections to the death penalty. *See Mayes v. State*, 887 P.2d 1288, 1297 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995); *See Witt*, 469 U.S. at 420–421, 105 S.Ct. at 850. The persuasive force of this argument is dissipated by the facts of the case.

Pacheo did not communicate a mere conscientious objection to the death penalty, he communicated a strong aversion to being placed in a position to decide, and he communicated the inability to impose the death penalty. Removal for cause of this venireman who could not follow the instructions of the court was proper. *Witt*, 469 U.S. at 424, 105 S.Ct. at 852.

■ Venireman Pyles was not removed for cause despite the fact her husband left her the day before, and she had lost her job two weeks earlier. She said she could not pay attention to the trial. When defense counsel asked her whether she would like someone in her frame of mind sitting on the jury if she were the defendant, she replied, "No." The trial court then asked Pyles if she could follow the court's instructions. When she replied she could, the trial judge denied the defense challenge for cause.

One is hard pressed to imagine circumstances more compelling for removal for cause. Pyles' promise to follow the court's instructions hardly cures the fundamental problem here; she could not keep her mind on the case given the chaos of her own life. Pyles should have been removed for cause, for in her present mental state she was not competent to serve as a juror.

■ Toles argues that because he was forced to remove Pyles with his last peremptory challenge, reversal is necessary for the jury panel was tainted with another unsatisfactory juror. Prior to challenging Pyles, defense counsel argued an additional "unsatisfactory juror" was also on the panel. Counsel did not name the juror or state why the juror was unsatisfactory. Our review of the record reveals nothing to suggest any seated juror was not competent. If the seated jury panel is competent, the fact the defendant had to use his peremptory challenge to achieve this result is irrelevant to a determination of constitutional error. *Tibbs v. State*, 819 P.2d 1372, 1378–79 (Okl.Cr. 1991); *Ross v. Oklahoma*, 487 U.S. 81, 88,

108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). There is no error here.

## ISSUES FROM THE GUILT/INNOCENCE STAGE OF TRIAL

### A. Denial of Suppression of Custodial Statements

Toles asserts in his fourth proposition that suppression of his custodial statements was improperly denied by the trial court. In response to the motion to suppress, the trial court properly held a *Jackson v. Denno*[1] hearing to determine whether Toles' custodial statements were voluntary. In that hearing uncontroverted evidence established the following sequence of events: 1) Toles asked for an attorney when he was arrested and placed in a squad car; 2) he received the *Miranda* warnings and again asked for his attorney when he arrived at the police station; 3) questioning was not begun, and he was told he would still have to be booked; 4) he stated he had changed his mind and he would talk to the police without counsel present; and 5) questioning was begun after this affirmative waiver.

Toles argues his waiver was not valid, for *all police contact* should have stopped when he asked for an attorney upon his initial contact with the police. He claims the subsequent *Miranda* warning violated his Fifth and Sixth Amendment right to counsel.

■ Under some circumstances the differences between the Fifth and Sixth Amendment right to counsel are of critical importance to a case. The Fifth Amendment right to counsel must be asserted by the accused and it covers interrogation concerning any offense, past or present, charged or uncharged. *See Valdez v. State*, 900 P.2d 363, 373 (Okl.Cr.), *cert. denied*, —— U.S. ——, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995). The Sixth Amendment right is offense-specific and attaches at the time judicial proceedings have been initiated against the accused. *Id.* at 374. These distinctions are not dispositive in the case before us, for the focus of our inquiry is on waiver.

■ Once the right to counsel has been asserted under the Fifth Amendment, or has attached under the Sixth Amendment, a valid waiver of that right cannot be established by showing *only* that the accused responded to further police-initiated custodial interrogation *even if* the accused has been advised of his rights. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981)(Fifth Amendment); *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977)(Sixth Amendment). An accused may change his mind, however, and affirmatively waive the right to counsel secured by either Amendment. *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1885; *Brewer*, 430 U.S. at 405, 97 S.Ct. at 1243. Police interrogation following an affirmative waiver does not run afoul of the constitution.

■ Toles asserted his right to counsel twice—first as he got into the squad car when he was arrested, and again following the administration of the *Miranda* warnings at the police station.[2] The record is clear that as soon as Toles asserted the right to counsel at the station, the police communication turned immediately to administrative matters and Toles was advised he would have to be booked into jail. It was not until Toles told the police he would talk to them without counsel that police questioning began. Toles waived his right to counsel with this affirmative statement.

■ Toles also argues the police coerced his confession with offers of leniency. At the *Jackson v. Denno* hearing the interrogating officers expressly denied making any offers to Toles. Relevant evidence on this question introduced at the hearing included three videotaped statements by Toles. One statement was taped the day of the murder; two statements were taped the day after the murder.

In the first statement Toles admitted being present during the murders but denied shooting anyone. In the second statement

---

1. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

2. The record indicates an Information had been filed before Toles was picked up, so the Sixth Amendment right to counsel had also attached.

he admitted he shot the victims. In the third he more fully explained his motives and the details of the crime. The interrogator asked Toles during the second taped interview why he admitted the shootings he had earlier denied. Toles replied he had talked with his mother who asked him how he would feel if his father and brother had been murdered.

To defeat a motion to supress, the State bears the burden to prove by a preponderance of the evidence the accused's statements were voluntary. *Crawford v. State,* 840 P.2d 627, 635 (Okl.Cr.1992), *appeal after remand,* 881 P.2d 88 (1994). The video-taped statement in which Toles explains the reason for his change of heart carries the State's burden. The trial court properly denied Toles' motion to suppress.

## B. Denial of Funds to Secure Presence of Expert Witness at Trial

The denial of funds to secure the presence of Dr. Jonathan Lipman, a neuropharmacologist from Illinois, is addressed in the second and third propositions of error. Toles argues he was denied both his defense by the executive director of the Oklahoma Indigent Defense System who refused to allocate funds to secure the presence of this expert witness, and effective assistance of counsel because counsel did not adequately challenge the executive director's action or present other evidence of voluntary intoxication. Toles has filed a motion for evidentiary hearing on this issue. We find the record is sufficient for our resolution, and the motion for evidentiary hearing is denied.

Illinois pharmacologist, Dr. Jonathan Lipman, was retained by the defense team to investigate and develop the defense of voluntary intoxication. Dr. Lipman interviewed Toles, reviewed his video-taped statements, and reviewed reports prepared by the police and a forensic social worker. The defense filed Dr. Lipman's report with the trial court. Dr. Lipman reported Toles had smoked eight rocks of crack cocaine prior to the murders, and had drunk beer in sufficient quantities to achieve a blood alcohol level of .596. He concluded Toles was "freefalling ... through a maelstrom of brain chemistry" and was unable to make rational decisions at the time

of the killings. In his offer of proof at trial, counsel stated Dr. Lipman would testify to Toles' blood alcohol level of .596.

Dr. Lipman's conclusion that Toles was unable to make rational decisions is controverted sharply by Toles' own statements taken six hours after the murders in which he revealed minute details of the invasion of the Franceschi home. The only details he did not reveal were those indicating his very direct involvement. The next day, after Toles spoke with his mother, Toles again clearly and rationally described the incident in minute detail, including his own thoughts about getting rid of the male witnesses, and his belief "the woman" was "too hysterical to worry about." Two days after the murders Toles stated he had not used any cocaine or "chemical" other than alcohol.

Toles was not denied access to an expert witness in the classic *Ake* sense. *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Toles obtained an expert who rendered an opinion. While it is true the executive director denied funding to secure the expert's presence at trial, no allegation has been made at trial or on appeal that *but for* inadequate financial resources this witness would have testified at trial.

The executive director of the Oklahoma Indigent Defense System has the statutory duty to guarantee effective representation for the indigent criminal defendant, and to serve in an advisory capacity to attorneys employed by the Oklahoma Indigent Defense System. 22 O.S.1991, § 1355.4(C)(6), (17). By statute the executive director is a member of the defense team, and the Court recognizes the fact that members of a defense team do not always agree on strategy. The executive director has the final say regarding issues which ultimately are decided fiscally, for he has the power to approve or deny requests for the expenditure of funds. *See* 22 O.S.1991, § 1355.4(F).

The record indicates the executive director's decision not to secure this witness for trial was based on trial strategy. The question therefore becomes one of effective assistance of counsel and is two-fold. Did the executive director deny Toles effective

assistance of counsel by deciding Dr. Lipman would not testify at trial, and if so, was trial counsel ineffective for not pressing the issue at trial?

The familiar standard of review for questions of effective assistance of counsel was set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To carry his burden to prove ineffective assistance, Toles must show the executive director's denial of funds was not reasonable considering all the circumstances, and this error prejudiced his defense. *Id.* at 687–88, 104 S.Ct. at 2064–65. Under the *Strickland* analysis we begin with the strong presumption that the decision not to present this witness was reasonable trial strategy. *Id.* at 689, 104 S.Ct. at 2065. If we find the executive director's decision was reasonable under the circumstances, our analysis ends there. If we find the decision was not reasonable under the circumstances, we must then determine whether there is a reasonable probability that but for the decision not to present Dr. Lipman, the result of trial would have been different. *Id.* at 694, 104 S.Ct. at 2068.

The contradiction between Dr. Lipman's report of debilitating intoxication and Tole's articulate, rational and thorough recounting of the facts in the video-taped interview taken just six hours after the murders, together with the very complete detail he recounted in subsequent interviews, is striking and irreconcilable. Toles' rational behavior was memorialized for the jury to see and hear. Dr. Lipman's report was based, in part, on subsequent interviews with Toles. The conclusions of the report are so thoroughly controverted and discredited by the video-taped interviews, that the jury could not believe both.

It appears the executive director decided the testimony of Dr. Lipman would not be helpful to the defense. This decision is rational and based on the facts and circumstances of this case. The decision not to call Dr. Lipman appears to be sound trial strategy, and the record contains nothing to overcome this presumption. Having found this decision reasonable, we need not analyze the question further.

In the third proposition of error Toles argues his trial counsel was ineffective for failing to challenge the executive director's decision more vigorously, and for not presenting any evidence of intoxication in the first stage of trial. No one who saw Toles' video-taped statements and heard Toles describe the events surrounding the murders and his reasons for killing would believe he was too intoxicated to form the intent to kill. No defense attorney has a duty to present a defense wholly discredited by the facts. Given these circumstances, we find trial counsel was not ineffective for failing to more vigorously challenge the executive director's decision, or for deciding not to present evidence on the question of intoxication.

## SENTENCING ISSUES

### A. Victim Impact Evidence

Norma Franceschi, wife and mother of the victims, and her daughter, Wendy, presented victim impact testimony in the second stage of trial. They responded to questions posed by the prosecutor to explain the financial, emotional, psychological and physical effects of the murders on them. They also told the jury about Juan and Lonnie as people. Toles raises three challenges in the seventh proposition of error to the admission of this evidence: 1) it was admitted without statutory authority; 2) it served as a unconstitutionally vague and overbroad "superaggravator;" and 3) it injected an arbitrary factor into the sentencing process, for the jury was not instructed as to its use.

We first address the general challenge that victim impact evidence operates as a "superaggravator" which is unconstitutionally vague and overbroad. We addressed this issue in *Cargle v. State*, 909 P.2d 806, 826 (1995), *cert. denied*, — U.S. ——, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). Victim impact evidence which is limited by the rules of evidence and the requirements of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment does not become a vague and overbroad "superaggravator."

■ Appellant also suggests the victim impact evidence in a capital case is not to be presented to the jury, but to the judge at sentencing. This interpretation is defeated by *Cooper v. State*, 894 P.2d 420, 422 (Okl.Cr. 1995), which held 21 O.S.Supp.1992, § 701.10(C) "clearly" allows a second stage sentencing proceeding in a capital case at which victim impact evidence may be presented to the jury.

In a capital murder trial, sworn victim impact evidence is admissible in the punishment stage. 21 O.S.Supp.1992, § 701.10(C). This evidence shall be "about the victim and about the impact of the murder on the family of the victim." *Id.* The admissibility of this second-stage evidence is limited by the state and federal constitutions, and the Oklahoma Evidence Code. *See Cargle*, 909 P.2d at 828; *Cooper*, 894 P.2d at 422.[3]

■ In *Cargle* this Court invited the trial bench to consider whether a question-answer format for victim impact evidence would be desirable. We answer that question today and hold victim impact evidence in the second stage of a capital trial is limited by all of the appropriate rules of evidence and criminal trial procedure, and may be presented as a narrative or in a question-answer format. In either case the declarant shall testify and be subject to cross-examination.

The testimony of Norma and Wendy Franceschi was within the relevant statutory, evidentiary and constitutional boundaries, and was properly admitted.

Appellant also argues the jury was not instructed as to how to use this evidence, and as a result was misled as to its role and responsibility in determining the appropriate

sentence. The State does not respond to this argument.

In *Cargle* this Court set forth an instruction to be used prospectively when victim impact evidence is introduced in the second stage of a capital murder trial. That instruction stresses the fact victim impact evidence is "not the same as" an aggravating circumstance and that it does not relieve the State of the burden to prove at least one aggravating circumstance beyond a reasonable doubt before a death sentence may be recommended. 909 P.2d at 828–29. The Court held the guidelines to admission of victim impact evidence and this new instruction, together with the Court's power to modify or remand under mandatory sentence review, is sufficient to assure the jury's verdict of death is a "reasoned moral response ... based on reason and reliable evidence." *Id.* at 829 (citing *Payne v. Tennessee*, 501 U.S. 808, 836, 111 S.Ct. 2597, 2614, 115 L.Ed.2d 720 (1991)).

Having found the need to add this instruction, we cannot say the standard capital instructions *alone* were adequate to fully protect the appellant's due process rights to fair sentencing. Therefore, we examine the sufficiency of the evidence supporting each of the aggravating circumstances to determine whether misuse of the victim impact evidence could have had an effect on the sentence imposed by the jury.

### B. Sufficiency of the Evidence

Four aggravating circumstances were found by the jury: 1) the defendant knowingly created a great risk of death to more than one person; 2) the murder was especially heinous, atrocious or cruel; 3) the murder was committed for the purpose of avoiding or

---

3. I have been concerned for some time that the admission of victim impact evidence will allow reversible error to creep into trial. *See Charm v. State*, 924 P.2d 754 (Okl.Cr.1996), (J. Lane dissenting); *Cargle v. State*, 909 P.2d 806 (Okl.Cr. 1996)(J. Lane concurring specially); *Ledbetter v. State*, 933 P.2d 880, (Okl.Cr.1997)(J. Lane concurring in result); *Conover v. State*, 933 P.2d 904, (Okl.Cr.1997)(J. Lane concurring in results). As I stated in my separate opinions in *Ledbetter* and *Conover*, I believe the Court has misinterpreted the statutory authority and has failed to distinguish properly the different form, content and

use of victim impact *evidence* authorized by Title 21 O.S.Supp.1992, § 701, and victim impact statements authorized by Title 22 O.S.Supp.1992, §§ 984, 984.1 and 991a. I accept the fact the Court, for the time being, has made its pronouncement on this issue. I do not rely on *Ledbetter* or *Conover* to decide this appeal, for neither one of these cases is on point. Those cases attempt to justify the admission of victim impact statements to the jury. In this case the district attorney followed the explicit mandates of Section 701.10 and properly introduced victim impact evidence to the jury in the second stage of trial.

preventing a lawful arrest or prosecution; and 4) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(2), (4), (5), (7). In his ninth proposition of error Toles challenges the sufficiency of the evidence as to each of these, except great risk of death to more than one person. We address the sufficiency of the evidence as to each of the aggravators, for we must determine whether the evidence is sufficient absent the victim impact evidence.

The "great risk of death to more than one person" aggravator is proven beyond a reasonable doubt by the fact Toles shot and killed two people. The victim impact evidence could not have been misused here.

In order to prove the "heinous, atrocious or cruel" aggravator, the State had to prove beyond a reasonable doubt the death of the victim was preceded by torture or serious physical abuse. *Smallwood v. State*, 907 P.2d 217, 234 (Okl.Cr.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996); *Revilla v. State*, 877 P.2d 1143, 1155 (Okl.Cr.App.1994), *cert. denied,* 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); *Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988). A slow, painful death satisfies this condition precedent. *See McCracken v. State*, 887 P.2d 323, 332 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); *Romano v. State*, 847 P.2d 368, 386–87 (Okl.Cr.) *cert. granted in part by* 510 U.S. 943, 114 S.Ct. 380, 126 L.Ed.2d 330 (1993); *Woodruff v. State*, 846 P.2d 1124, 1147 (Okl.Cr.), *cert. denied,* 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993); *Duvall v. State*, 825 P.2d 621, 634 (Ok.Cr.1991), *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992).

When Toles shot Juan Franceschi in the chest, the .22 caliber bullet pierced his lung and lodged in his back. Franceschi died as a result of two pints of blood leaking into his chest cavity and suffocating him. The

medical examiner testified the wound did not cause immediate loss of consciousness, and the record shows Franceschi did not die until the paramedics arrived. This slow, lingering death ·is sufficient to prove serious physical abuse. *See Romano*, 847 P.2d at 386–87; *Woodruff,* 846 P.2d. at 1147; *Duvall,* 825 P.2d at 634.

Toles shot Lonnie Franceschi in the back of the head. After Toles ran out of the house, Lonnie managed to get to his room where his mother heard him crying and gasping for air. The medical examiner testified this injury would have been extremely painful. We do not know exactly when Lonnie lost consciousness, but we know he did not lose consciousness immediately. Again, the slow, painful sinking into unconsciousness is sufficient to prove serious physical abuse.

Toles told detectives during his video-taped statements that he shot Juan and Lonnie Franceschi because they could identify him. He said he did not shoot Norma Franceschi, because he thought she was too hysterical to identify him. The aggravating circumstance that the murders were committed to avoid or prevent lawful arrest or prosecution was thus proven by the defendant's own words.[4]

The final aggravating circumstance found by the jury is the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Evidence supporting this aggravator was admitted through three second-stage witnesses who testified to prior crimes Toles committed. Before we determine sufficiency of this evidence we must address the sixth proposition of error in which Toles argues this testimony was inadmissible for the State did not give the defense proper notice these witnesses would be called in the second-stage. In response the State argues there is no statutory requirement to list witnesses according to trial stage, and its verbal notice and disclosure of the file is sufficient notice.

The State filed notice of twenty-seven witnesses and a summary of their testimony.

4. The requirement of the underlying felony is satisfied by the burglary of the home.

Norma Franceschi was the first listed witness. The summary of her testimony stated she "will also" testify in the second stage. Wendy Franceschi was the twenty-third witness, and her summary stated she would testify in the second stage. The remaining six witnesses were not designated as second-stage witnesses, but the summary of their testimony made clear they would testify to prior crimes committed by the defendant. At trial, defense counsel objected to their testimony on the grounds he lacked notice of their second-stage appearance. The prosecutor argued he had filed a list of witnesses and summary testimony; he had told defense counsel who the second-stage witnesses would be;[5] and he showed his entire file to defense counsel. The trial court overruled the objection and five of the seven witnesses testified.

 Notice by the prosecution to the defense of the evidence to be introduced in support of the aggravating circumstances is required by statute. 21 O.S.1991, § 701.10(C); *Walker v. State*, 887 P.2d 301, 316–17 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995). The question before us now is whether the State's notice was sufficient.[6] Pivotal to the resolution of this issue is the fact the summary of testimony provided by the State was accurate and complete. No witness testified to matters not revealed to the defense. Additionally, it would be plain to any attorney qualified to try a death case that the testimony of the last seven witnesses would only be admissible in the second stage of trial in support of the "continuing threat" aggravator. In truth, there was no surprise in this testimony. Given these facts, we do not find the omission of designating stages in which the testimony would be offered violated Toles' right to due process.

 We now examine this evidence to determine whether the "continuing threat" aggravating circumstance was proven be-

yond a reasonable doubt. Evidence relevant to the proof of this aggravating circumstance includes prior convictions, prior unadjudicated crimes and other acts which show a pattern of conduct that would indicate a propensity toward violence that likely would continue in the future. *Johnson v. State*, 928 P.2d 309, 317–18 (Okl.Cr.1996); *Perry v. State*, 893 P.2d 521, 536 (Okl.Cr.1995); *Malone v. State*, 876 P.2d 707, 717 (Okl.Cr. 1994). Three second-stage witnesses testified in support of this aggravating circumstance with evidence of unadjudicated crimes.

Newton Onco testified that on March 7, 1992 he accompanied a woman who was driving around Anadarko looking for her boyfriend. They pulled over when the driver behind them flashed his headlights. Toles came up to the passenger side of the car and hit Onco twice in the face, knocking out a tooth. He kicked Onco when Onco got out of the car. Onco and the woman sped away when Toles told someone in the car to get his gun. Onco did not know Toles and did not know why Toles attacked him.

Jimmy Dorsey testified to a separate incident which occurred on April 28, 1992. Dorsey and Charles Hugar left Dorsey's home to go to the store when Toles approached them and accused Hugar of trying to beat up his brother a few days earlier. Hugar denied knowing anything about this. Dorsey and Hugar went back inside. About twenty minutes later Toles came to the house with an unspecified number of friends and someone kicked in the front door, broke a window, threw the television antenna into the house and hit Dorsey with part of the window molding when he tried to leave his home. On cross-examination Dorsey admitted he did not know whether Toles himself did the damage to the home and threw the molding at him.

Teta Johnson and her daughter, Amy Gooday, testified Toles broke into their home during the night of September 13, 1991 and

5. Defense counsel denied being told this information.

6. The state constitutional requirement that in a capital case the accused shall be furnished at least two days before trial with a list of witnesses

that will be called in chief does not apply to second-stage witnesses *Ellis v. State*, 867 P.2d 1289 (Okl.Cr.1992), *cert. denied*, 513 U.S. 863, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994); Okla. Const. art. II, § . 20.

tried to steal their television. Ms. Gooday grabbed the cord as Toles crawled out of the window. Toles then dropped the television and fled.

Other relevant evidence to prove continuing threat comes from the murders themselves. Toles armed himself in preparation for the home burglary, and he shot Juan and Lonnie Franceschi in cold blood.

These incidents show a pattern of escalating violence. Two years before the murders Toles burglarized a home unarmed, and when he was confronted, he fled. The night of the murders Toles armed himself before going into the home, and when confronted, shot two men in cold blood. Four months before the murders Toles attacked a man with his bare hands and then called for his gun. Three months before the murders Toles initiated another unprovoked attack. This pattern establishes the probability Toles would commit acts of violence in the future which would constitute a continuing threat to society.

Each of the aggravating circumstances found by the jury is supported by the evidence, and none of the aggravating circumstances were proven using victim impact evidence. Therefore, the absence of a limiting instruction does not require modification or reversal of sentence.

## C. Constitutionality of the Aggravating Circumstances

Toles challenges each of the aggravating circumstances found by the jury in this case on the ground it is unconstitutionally vague and overbroad. As this challenge is raised in almost every capital appeal, the jurisprudence of this State is very well developed in this area.

The "great risk of death to more than one person" aggravator has been analyzed thoroughly and found to withstand constitutional challenge. *See Malone*, 876 P.2d at 716 (Okl. Cr.1994); *Trice v. State*, 853 P.2d 203, 220 (Okl.Cr.), *cert. denied*, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

The "heinous, atrocious or cruel" aggravator likewise has been analyzed thoroughly and, when properly limited by the conditions precedent of torture or serious physical abuse, found to be consistent with the mandates of the Eighth and Fourteenth Amendments. *See Valdez* 900 P.2d at 381; *Mayes*, 887 P.2d at 1319; *Bryson v. State*, 876 P.2d 240, 259 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995); *Fisher v. State*, 845 P.2d 1272, 1274–75 (Okl. Cr.1992), *cert. denied*, 509 U.S. 911, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1993).

The aggravating circumstance, "that the murder was committed to avoid lawful arrest or prosecution" likewise has been found to be neither vague nor overbroad. *Castro v. State*, 844 P.2d 159, 175 (Okl.Cr.1992), *cert. denied*, 510 U.S. 844, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993); *Fox v. State*, 779 P.2d 562, 575 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990); *Munson v. State*, 758 P.2d 324, 335 (Okl.Cr. 1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989).

The "continuing threat" aggravator also is neither vague nor overbroad. *Malone*, 876 P.2d at 715–16; *Snow v. State*, 876 P.2d 291, 298 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995); *Sellers v. State*, 809 P.2d 676, 690 (Okl.Cr.), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991).

## D. Prosecutorial Misconduct

■ Toles raises five instances of alleged prosecutorial misconduct in his eighth proposition of error. The first instance is the prosecutor's statement that Amy Gooday, a second-stage witness, would testify that Toles fondled her breasts when he burglarized her home. She did not so testify. Appellant relies on *Martin v. State*, 487 P.2d 1179 (Okl.Cr.1971), *overruled on other grounds by Harris v. State*, 773 P.2d 1273, 1275 (Okl.Cr.1989), to argue it is improper for the prosecutor to state he will present evidence which he knows will not get to the jury. *Martin* is not on point. In that case this Court reversed because the prosecutor mentioned in opening argument, and presented to the jury, evidence which at the time was inadmissible—the defendant's refusal to take a blood alcohol test.

It is error for the prosecutor to refer to evidence that is not presented at trial. However, this irrelevant, collateral issue which was disproved by Gooday's testimony could have had no effect on the jury and does not warrant relief.

In the next two instances of alleged misconduct Toles complains that the prosecutor commented on facts not in evidence, and appealed to societal alarm. We have reviewed the comments and find the prosecutor was well within the bounds of proper argument. The next two allegations were not raised at trial and are thus waived for all but plain error. *Carter v. State*, 879 P.2d 1234, 1253 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995). Appellant claims the prosecutor expressed his personal opinion of the death penalty and tried to keep the jury from considering mitigating evidence. The record does not support these arguments. The prosecutor did not give his personal opinion of the death penalty; he argued why the death penalty was appropriate in this case. As to the mitigation evidence, the prosecutor did not argue the jury should disregard it, he properly argued his position on its relative strength. There is no error here.

### E. Jury Instructions

Toles raises four challenges to the jury instructions in his tenth proposition of error. Each of these challenges has been clearly resolved against him in an unbroken line of case law.

■■■ Toles first argues the trial court improperly instructed the jury on the procedure for weighing aggravating circumstances against mitigating evidence. The trial court properly instructed the jury using standard instruction OUJI–CR 440:

> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

There is no error here. *See Neill v. State*, 896 P.2d 537, 557 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996); *Rogers*, 890 P.2d at 977. We consistently hold the trial court is under no obligation to instruct the jury it has the option to return a life sentence regardless of the weight of aggravating circumstances. We find no reason to revisit this issue. *See Valdez*, 900 P.2d at 385; *LaFevers v. State*, 897 P.2d 292, 308 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996); *Neill*, 896 P.2d at 557.

Toles next claims the jury should have been instructed its findings of mitigating circumstances did not have to be unanimous, and the instructions as a whole imply unanimity is required. We have considered the standard jury instructions given in this case and found no additional instruction on this issue is necessary. *See LaFevers*, 897 P.2d at 309–10; *Scott v. State*, 891 P.2d 1283, 1297 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 784, 133 L.Ed.2d 735 (1996).

In his final challenge to the jury instructions Toles argues the standard instructions allowed the jury to ignore mitigating evidence and diminished the effect of mitigating evidence in this case. The language of the standard instructions has been considered thoroughly by this Court, and we find it properly instructs the jury on the use of mitigating evidence. *See Rogers*, 890 P.2d at 978; *Harjo*, 882 P.2d at 1079.

### F. Accumulated Error

In his final proposition of error the Toles argues the accumulation of error in his case warrants reversal. Error in this case consists of the failure to excuse venireman Pyles for cause, and the absence of an instruction to the jury on the use of victim impact evidence. We found the defense removal of venireman Pyles by peremptory challenge cured the first error, and the second error was harmless, for the remaining evidence proved each of the four aggravating circumstances beyond a reasonable doubt. When considered in aggregate, these errors do not gain significance.

## MANDATORY SENTENCE REVIEW

This Court must determine in every capital case 1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and 2) whether the evidence supports the jury's findings of aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. 21 O.S.1991, § 701.13(C).

We have determined in the course of appellate review that each of the four aggravating circumstances found in this case was supported by the evidence. Toles admitted he shot the victims because he thought they could identify him. He killed more than one person. The slow, lingering deaths of both Juan and Lonnie Franceschi satisfy the finding their deaths were preceded by serious physical abuse. Toles' evolution from committing an unarmed burglary to committing an armed burglary, his unprovoked barehand attack of Newton Onco, his unprovoked confrontation with Charles Hugar, and his shooting of Juan and Lonnie Franceschi in cold blood during a burglary create a pattern of behavior which proves the existence of a probability that he would commit criminal acts of violence that would constitute a continuing threat to society.

■ Because victim impact evidence was presented without a limiting instruction, we must determine whether this evidence created an influence of passion, prejudice or any other factor in the sentencing decision.

Each of the four aggravating circumstances found in this case was supported by strong evidence. The victim impact evidence addressed only those issues determined to be appropriate by the legislature: the financial, psychological, physical and emotional impact of the murders on Norma and Wendy Franceschi. The victim impact evidence was properly limited and did not invite vengeance or rage, passion or prejudice. Given the strength of the evidence supporting four aggravating circumstances, the fact the victim impact evidence was not relevant to proving any of them, and the proper content of the victim impact evidence, we find beyond a reasonable doubt the victim impact evidence did not influence the death sentences im-

posed in this case. The sentences of death are supported by the facts and were not imposed under the influence of passion, prejudice or any other arbitrary factor.

Judgment and Sentence is affirmed for the crimes of Murder in the First Degree (two counts), Conspiracy to Commit Robbery, and Possession of a Weapon After Former Conviction of a Felony.

CHAPEL, P.J., and STRUHBAR and JOHNSON, JJ., concur.

LUMPKIN, J., concurs in results.

LUMPKIN, Judge concurring in results:

Because I find the judgment and sentence in this case should be affirmed, I agree with the outcome here. Because I do not find part of the analysis, including the victim impact evidence discussion, is at all correct, I concur only in result. In addition, while I compliment my colleague for the work put into his analysis of the statutory framework allowing victim impact evidence set out in his Concur *In Results in* Ledbetter v. State, 933 P.2d 880 (Okl.Cr.1997), and *Conover v. State,* 933 P.2d 904 (Okl.Cr.1997), I take this opportunity to set out a more complete review of the statutes authorizing victim impact evidence.

### I.

Before we deal with the victim impact evidence, there is one point which must be addressed, because it is simply wrong. The opinion (page 188) states "[v]ictim impact evidence which is limited by the rules of evidence and the requirements of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment does not become a vague and overbroad 'superaggravator.'" (emphasis added).

The whole point of Payne was that victim impact evidence was not governed by the Eighth Amendment. *See Cargle v. State,* 909 P.2d 806, 826 (Okl.Cr.1995), cert. denied, — U.S. —, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996) ("We must be cognizant of the fact that, although it does not violate the Eighth Amendment, evidence may be introduced 'that is so unduly prejudicial that it renders

the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment. *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991)."). Therefore, any language here which deals with the Eighth Amendment is incorrect.

## II.

Concerning the use of victim impact evidence, the flaw in my colleague's discussions in *Ledbetter, Conover,* and now footnote 3 of this opinion lies in his inability to reconcile the semantics of 21 O.S.Supp.1992, § 701.10(C), which specifically reads that " the state may introduce evidence about the victim and about the impact of the murder on the family of the victim," and the provisions of 22 O.S.Supp.1993, §§ 984–984.2, which utilizes "victim impact statement" versus "evidence". Regrettably, in the capital murder statute itself, the Legislature gave the courts no guidance as to what the scope of that evidence is.

Instead of turning to the provisions of 22 O.S.Supp.1993, § 984(1) to determine the scope and manner of presentation of victim impact evidence, my colleague previously proposed to allow only evidence about the victim and the impact of the murder on the family of the victim at the sentencing stage of the trial itself, then allow introduction of a statement (analogous to the defendant's right of allocution) at the actual, formal sentencing proceeding. There are two main flaws in this analysis.

### A.

First, I see nothing in the Evidence Code prohibiting the introduction of a statement, any more than I see a requirement that all evidence be introduced in a question-and-answer format. The Court's opinion in this case has recognized and adopted that position. The validity of that determination is more than merely a pronouncement by this Court. If one subscribes to the generally accepted precept of what "evidence" is—that which tends to show that a fact of consequence to the resolution of a controversy either exists or does not exist—it seems obvious that, from a strictly evidentiary point, a statement which otherwise meets constitutional requirements is admissible, subject to the demands of relevancy. See 12 O.S.1991, §§ 2401–2403.[1] This would be the case whether the evidence is presented in a question-and-answer format (certainly allowable, see *Cargle,* 909 P.2d at 828, or in a statement form. *Id.*)[2]

### B.

Nor do I agree with the proposed rationale that a statement would be allowed only in the

1. A statement under these conditions meets constitutional requirements. The witness who reads the statement is first put under oath, and is subject to cross-examination as to the validity of the comments contained in the statement.

 I am not persuaded by any argument that a statement containing comments by more than one victim survivor, presented by only one victim survivor, constitutes a hearsay problem *simply because* the comment is advanced in a statement instead of a question-and-answer format. The same problem of hearsay would be contained in a question-and-answer format as it is in a statement format. A defendant who objected to hearsay statements could find the strategy backfire, as the prosecutor would argue that to circumvent the hearsay problem, he/she should be allowed to call each and every victim survivor to give his/her own evidence as to the impact of the victim's death on the witness. Surely that is not the purpose of allowing victim impact evidence.

2. I agree with the opinion (page 189, n. 3) that the improper admission of victim impact evidence could allow reversible error to "creep into

trial". Granted, the introduction of victim impact evidence presents a risk of error, because it is presented at a very critical phase in a capital murder case. However, that is no reason in and of itself to prohibit the use of such evidence. Indeed, the introduction of *any* improper evidence, whether victim impact evidence or not, into a critical phase of a trial could allow reversible error not only to "creep into trial," but practically gallop in. Following this previously proposed reasoning to its illogical conclusion, this Court should prohibit the introduction of *any* evidence at a critical phase of a trial to avoid that danger. Obviously, that is untenable, as it would prohibit not only victim impact evidence, but any evidence related to an aggravating circumstance which the prosecution is seeking to prove. Rather, the solution is to treat the evidence in a fashion similar to the way in which a court treats introduction of aggravating circumstances: very carefully, with appropriate notice requirements, instructions and—in the case of victim impact evidence—an in-camera hearing before the evidence is presented. That was addressed in *Cargle,* 909 P.2d at 828–29.

formal sentencing stage, after the factfinder has rendered its punishment. A cursory look at what transpires during formal sentencing shows the absurdity of this theory.

(1) If the jury did *not* recommend the death penalty, the defendant has been "acquitted" of it, and all the written statements in the world will not change the result in the formal sentencing hearing.

(2) If the jury *did* recommend the death penalty in second stage, the introduction of a statement by victim's survivors would have no influence whatsoever during formal sentencing, as the death penalty has already been given, and it would take a very brave judge indeed to countermand the jury's recommendation.[3]

In either case, the introduction of the statement in the formal sentencing hearing serves no purpose, and the Legislature has committed a vain act. The substantive effect of the proposed analysis is the Legislature intended to merely toss the victims of crime a legal placebo to placate them for a political purpose. I cannot ascribe to that cynical of a view regarding the legislative process.

Regardless of the personal feelings of the judges of this Court, the Legislature has indicated that victim impact evidence has a proper place in a capital murder trial. This Court's job is to review that evidence, along

---

3. And that is assuming the judge could legally do so. Section 926 of Title 22 reads:

> *In all cases* of a verdict of conviction *for any offense* against *any of the laws of the State of Oklahoma*, the jury may, and *shall* upon the request of the defendant, assess and declare the punishment in their verdict within the limitations fixed by law, and the court *shall* render a judgment according to such verdict, except as hereinafter provided.

(emphasis added). By the plain language of the statute, once the jury has assessed the death penalty for first degree murder (an offense against a law of this state), the court shall render the judgment according to the verdict (the exceptions, found at Sections 927 and 928, do not apply here).

This interpretation is re-enforced by language in other statutes as well. Section 991a of Title 22 reads:

> A. Except as otherwise provided [in an act not at issue here], when a defendant is convicted of a crime *and no death sentence is imposed*, the court shall either:
>
> 1. Suspend the execution of sentence in whole or in part, with or without probation....
>
> ....
>
> D. When sentencing a person convicted of a crime, the judge shall consider any victim impact statements if submitted to the jury, or the judge in the event a jury is waived.
>
> ....(emphasis added)

This makes it clear that suspension of a sentence is not applicable or permissible when the sentence of death is imposed; therefore, a judge would be without authority to modify a death sentence (although he could certainly state any recommendations in the trial judge's report, *see* 21 O.S.1991, § 701.13(A); 22 O.S.Supp.1995, Ch. 18, App. *Rules of the Court of Criminal Appeals*, Form 13.12, at Section (E)(12)). Admittedly, it appears the statute which took effect on July 1, 1996, changed the language in subsection (D). That section reads: "When sentencing a person convicted of a crime, the court shall consider any victim impact statement if submitted to the court." However, a review of the Session Laws convinces me this was a scrivener's error. The Session Laws clearly show the language quoted in the newest version of the statute is in reality language which existed in the statute before the Legislature widened the scope in which victim impact evidence could be made. *See* Laws 1994, c. 1, § 1 ("When sentencing a person convicted of a crime, the ~~court~~ *judge* shall consider any victim impact ~~statement~~ *statements* if submitted to the ~~court~~ *jury, or the judge in the event a jury is waived*."). The title to the bill in this chapter clearly shows the Legislature's intent to modify this section ("...; modifying the submission of certain impact statements; ..."). This new language remained unchanged in further modifications to the statute in the 44th Session of the Legislature. *See* Laws 1994, c. 308, § 1; Laws 1994, c. 188, § 1. At first glance, the changes noted above would appear to have reverted back to the original language of the statute. *See* Laws 1994, c. 40, § 1. However, there are no additions or deletions to the language, the widely accepted method by which the Legislature in the Session Laws shows its intent to change existing law. Furthermore, a reading of the Title to this amendment clearly shows the Legislature was focused on the modifications relating to the taking of DNA samples from a person convicted of an offense. Indeed, there is no mention in the title evincing an intent by the Legislature to revert to the old language it had amended in the very same session. From this, I can gather no conclusion other than the reversion to the old language dealing solely with the court, and not the jury, is simply a scrivener's error.

The point is this: the Legislature, by its changes (or non-changes) to portions of the criminal procedure statutes relating to the presentation of victim impact evidence clearly shows (at least in capital cases, the only issue which is before us) a legislative intent to allow presentation of that evidence to the jury, and not simply the judge at a hearing where presentation of the evidence would be rendered moot.

with all other evidence presented, to determine whether its introduction presents error—and if so, whether that error rises to the level of a Due Process violation requiring reversal. To do more is to legislate from the bench, an action we all should agree is inappropriate and not a function of the judicial branch of government.

### III.

One other thing warrants comment. I am puzzled and disturbed by a statement in the opinion (page 189, the last paragraph before subsection "B") where it notes a particular instruction was inadequate to fully protect the appellant's due process rights to a fair sentencing. The opinion then says: "Therefore, we examine the sufficiency of the evidence supporting each of the aggravating circumstances to determine whether misuse of the victim impact evidence could have had an effect on the sentence imposed by the jury." If I read this paragraph correctly, the opinion is stating an error in instructions occurred, then it *conducts a harmless error analysis using sufficiency of the evidence as the method of analyzing the error.* Those are two different questions. It appears the opinion is omitting the evidence caused by the error, then re-weighing the evidence to determine whether it is sufficient to warrant the death penalty, instead of determining whether the evidence was harmless. It appears this Court is mixing apples (harmless error analysis) and oranges (sufficiency of the evidence).

Additionally, the opinion states it intends to "determine whether the evidence is sufficient absent the victim impact evidence." (Page 190). However, the opinion also states "the testimony of Norma and Wendy Fran-

ceschi was within the relevant statutory, evidentiary and constitutional boundaries, and was properly admitted." Page 189. These are inconsistent comments, for they make the victim impact evidence sound suspiciously like a "superaggravator,", even though the opinion says it is not, which the opinion then omits and "reweighs" to determine if the "remaining" aggravators outweigh mitigating evidence presented.[4] This cannot be the intent of the opinion, for it rejects the very premise stated earlier, based on an earlier rejection in *Cargle.* In addition, this Court did not find an error in instructing the jury in *Cargle,* but promulgated an instruction to be used in future cases. In fact, there was not an instruction on victim impact evidence in *Cargle* and this Court found any error in the scope of the evidence presented was harmless beyond a reasonable doubt. It was the amount and type of victim impact evidence presented in *Cargle* which was error, not the lack of an instruction. In this case, there was no error in the type and amount of evidence presented. The sufficiency of the evidence analysis in this opinion is mislabled and should be considered as a part of our mandatory sentence review.

In regard to Proposition V, appellant alleges the Court erred in failing to remove venireman Pyles for cause. While it would have been extremely difficult for Mrs. Pyles to have fulfilled her role as a juror, the record is void of any evidence showing her to be "not competent to serve as a juror". Page 186. However, I agree with the Court's decision there was no error.

In addressing the issue of ineffective assistance of counsel in Proposition IV, the Court relies on *Strickland v. Washington,* 466 U.S.

---

**4.** I do not by these comments intend to convey the impression that reweighing is not proper when an *aggravating circumstance* is found to be infirm. In a "weighing" state (such as Oklahoma), after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence to determine whether the death penalty is appropriate. In a weighing State, where the process is infected with an invalid aggravating factor which might require invalidation of the death sentence, "a state appellate court [can] reweigh the aggravating and

mitigating circumstances or undertake harmless-error analysis." *Stringer v. Black,* 503 U.S. 222, 230, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367 (1992) (emphasis added) (discussing *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)). My point is that it is a grave error to treat victim impact evidence like another aggravator, which the Court can omit and "reweigh" the "remaining" aggravators against the mitigating evidence. Rather, the proper course is to determine, in the mandatory sentence review, whether effect of the improper evidence (or here, improperly used evidence) was harmless.

**198**

668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Page 188. Based on the legal evolution of the *Strickland* standard, the correct standard of review is whether counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable, not merely if the result of trial would have been different. *See Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189 (1993). Applying that correct standard, I agree with the Court that counsel was not ineffective.

For all these reasons, I concur in results.